## CABELL HUNTINGTON HOSPITAL EMERGENCY DEPARTMENT

### TITLE: TRANSPORTING O.B. PATIENTS TO LABOR AND DELIVERY

**PURPOSE: (OUTCOME STANDARD):**
To provide a guideline for determining the appropriate department for assessment and treatment of the Obstetric patient based upon presenting problem and gestational age.

**STEPS IN PROCEDURE: (PROCESS STANDARD):**
1. Upon arrival assess the patient's complaint. Only patients presenting with complaints related to pregnancy (contractions, vaginal bleeding, abdominal pain, etc) and a confirmed pregnancy 20 and greater week's gestation should be referred to the LDR unit. Other non-pregnancy related complaints (trauma, respiratory, etc) below 20 weeks gestation should be evaluated in the ED with consultation from Obstetrics at the discretion of the ED Physician.
2. The patient should be provided a wheelchair or stretcher and transported to LDR immediately deemed appropriate. If the patient states that they would prefer to walk and have a friend/family member with them, they may be escorted to LDR by Security/ED staff.

Revised: 3/95, 7/96, 12/04, 06/08
Reviewed: 7/99, 4/02, 02/10, 04/13 MS

PLAINTIFF'S
EXHIBIT
1
tabbies

# In The Matter Of:

## *ROBERT A. FLAUGHER*
### *vs.*
## *CABELL HUNTINGTON HOSPITAL, INC., ET AL*

---

## *SHAWNA MORRIS*
### *October 30, 2014*

---

**MERRILL LAD**

1325 G Street NW, Suite 200, Washington, DC
Phone: 800.292.4789   Fax:202.861.3425



PLAINTIFF'S
EXHIBIT
2

SHAWNA MORRIS - 10/30/2014

Page 38

1    Q.   Saturday?  Okay.
2    A.   I'm pretty sure it was Saturday.
3    Q.   Do you know how many patients you had to triage
4    during the one shift?
5    A.   No.
6    Q.   Was it 5, 10, 20?
7    A.   Not 20.  Less than 15, more than 10.
8    Q.   Okay.  And for those 15 patients, can you give
9    me an idea, because it was only a few days ago, what is
10   the amount of time that ---?
11   A.   Well, sometimes seven people show up at once and
12   I only have six beds.  It's not like they show up and
13   then I have an hour and then another one shows up.
14   Sometimes it's feast or famine.  I can't give you a
15   specific time, because triage is like the ER, not
16   everybody walks in with a bump.  Some people walk in
17   with a bleeding wound versus a --- you know, a bug bite.
18   So I mean, ---
19   Q.   Okay.
20   A.   --- some of our patients get triaged for RhoGAM
21   injections, you know, which is an in-and-out and
22   sometimes they have to wait in order for me to get
23   somebody else with a higher acuity.  It just depends.
24   Q.   Okay.  Let's assume that there's nobody else

Page 39

1    waiting to be triaged, ---
2    A.   Uh-huh (yes).
3    Q.   --- a patient shows up at the window.
4    A.   I'll take them back right away, as soon as we
5    get their information to send it down to Registration.
6    Q.   Got it.  Okay.  And if --- if seven people show
7    up at the same time, you ask for help; right?
8    A.   Yes.
9    Q.   Okay.  All right.  Now, for Dr. Rumman's
10   situation, did you have a chance to review her medical
11   chart before today?
12   A.   No.
13   Q.   Did --- did you at least look at her medical
14   charted today?
15   A.   Yes.
16   Q.   Okay.  When you were informed you were to give
17   deposition testimony for the case involving Dr. Rumman,
18   now this is almost three years ago, did you have a
19   memory ---
20   A.   Yes.
21   Q.   --- of this case?  Okay.
22   A.   I remember her.
23   Q.   I want you to tell me what you remember.
24   A.   I remember she came in probably 40 minutes

Page 40

1    before shift change.  She was wheeled up in a wheelchair
2    by a nurse from the ER or a PCA, one of the two.  She
3    was wrapped in blankets.  She had a khaki-colored
4    blanket wrapped around her lap and she had a white woven
5    blanket, kind of like they use at the VA, over her head.
6    She was shrouded and she was kind of bent over.  She had
7    a young person with her, a younger person, a female.
8    Brandy was at the window.  The younger female started to
9    fill out the paperwork so that we could get the
10   information directly sent downstairs.  And in that
11   meantime, I came by.  I could see her and I said, well,
12   let me go ahead and take her to the room.  She needs to
13   be seen.  And her friend stayed at the window to fill
14   out paperwork.
15   I remember I put her in Room Four because it's off to
16   the right of the computer, and I instantly took her back
17   to the room.
18   Q.   This happened right away?
19   A.   Yes.
20   Q.   There was no ---?
21   A.   She was seen right away.
22   Q.   She was seen right away.  Wow.  Okay.  You've
23   got a pretty good memory.  Does this --- does this
24   incident stick in your mind?

Page 41

1    A.   I have an eidetic memory, so ---.
2    Q.   Okay.  Tell me what you remember next.
3    A.   I wheeled her to Room Four, it was right off to
4    the side of the computer, while the young lady stayed at
5    the desk so that she could get that paperwork straight
6    down to Registration.  I helped her get to the stretcher
7    and put up one side of the safety rail.  I explained to
8    her --- you know, asked her what her chief complaint was
9    here.  You know, she said that she woke up that morning
10   with a high fever, general malaise and wasn't feeling
11   well.  She was slow to answer questions, said that she
12   had taken some, Tylenol, went to work, actually saw
13   patients herself.  Tried to go to the grocery store and
14   then waited to pick her son up at daycare before
15   realizing that her fever and chills were not getting
16   better with the Tylenol and she felt like she needed to
17   come in.  I specifically asked her --- she denied loss
18   of fluid, vaginal bleeding, unusual discharge or
19   cramping.
20   Q.   That's an amazing memory you have.
21   A.   Thank you.
22   Q.   Did you make any notes of this, ---
23   A.   No.
24   Q.   --- keep any notes?  This is all from what you

11  (Pages 38 to 41)

SHAWNA MORRIS - 10/30/2014

Page 50

1    Q.  Is that the only patient that you can remember
2  with respect to the time that you saw a patient on that
3  day?
4    A.  I had two RhoGAMs that day.
5    Q.  I'm sorry?
6    A.  I'm trying to think back.  Not at this time.
7    Q.  Okay.  And that'd be the same question for the
8  patients you saw the day after Dr. Rumman was in the
9  hospital.
10    A.  I didn't work that day after.
11    Q.  The very next day you came in to work, do you
12  remember the times you saw any of those patients?
13    A.  Well, if somebody gave me a name ---.  I mean, I
14  don't just --- you know, something has to trigger it and
15  then I'm like, oh, I remember that lady, she had the red
16  purse and she walked in and she was eating that or ---.
17    Q.  Okay.  Now, when you performed the triages, how
18  long --- how much time did you actually spend with Dr.
19  Rumman?
20    A.  Twenty (20) minutes maybe.
21    Q.  Twenty (20) minutes?
22    A.  Twenty (20), 25.
23    Q.  Other than --- did --- on page 499, did you
24  write the words or type the words into the computer

Page 51

1  patient arrived to triage from home for new onset fever;
2  patient shown to room, instructions given for gown ---
3  gown placement and cc urine specimen collection?
4    A.  Yes.
5    Q.  Are those your initial --- initials SM where it
6  says recorded by?
7    A.  Yes.
8    Q.  And is that your identification number for the
9  hospital, 987764?
10    A.  Correct.
11    Q.  Okay.  Now, at 1849 did you make another entry
12  in the chart?
13    A.  Yes.
14    Q.  Okay.  And what was that entry?
15    A.  Urine specimen sent to lab for UA.
16    Q.  When you say report given to Whitney Pinkerton,
17  is that because you told Nurse Pinkerton that you sent
18  the urine specimen to the lab?
19    A.  That was the report off --- I documented that I
20  sent this lady's urine to the lab ---
21    Q.  Right.
22    A.  --- and then I gave a verbal report to Whitney
23  ---
24    Q.  Okay.

Page 52

1    A.  --- on the patient.
2    Q.  And what did you tell Whitney?  The same thing
3  you just told us?
4    A.  Yes.  She had a dark, foul-smelling urine.  I
5  sent it down to the lab.  She's complaining of a fever
6  that started this morning.  She took some Tylenol.  She
7  went to work.  She went to the store.  She picked up her
8  son.  The fever wasn't going away.  She was starting to
9  really feel bad, worse than she did when she woke up
10  with general malaise.  I was like she's still wrapped up
11  in blankets.  I tried to drape them off of her.  I said
12  she's got a warm blanket in there and she agreed to
13  finally change into a gown.  I said she doesn't feel
14  good.  She's kind of hunched over.  I said with that
15  urine she probably has a UTI or pyelo or ---
16  pyelonephritis or, you know, something to that.
17    Q.  Do you know the names of the nurses who were
18  working in the emergency room that day?
19    A.  No, I do not.
20    Q.  So you would not be able to tell me the names of
21  the emergency room nurses who wheeled Dr. Rumman into
22  the OB triage unit; would that be a fair statement?
23    A.  Yes, that would be fair.
24    Q.  Okay.  All right.  Now, did you have the ability

Page 53

1  to perform a Doppler study on Dr. Rumman during the time
2  period that you saw her?
3    A.  No.
4    Q.  Why not?
5    A.  Patient was uncooperative.  It was everything I
6  took to do to get her into a gown so I could --- the
7  next nurse could --- or next person in the room could
8  assess her, period.
9    Q.  Was --- was your --- was it your intention to
10  perform a Doppler study on her to see whether her baby
11  was still alive when you saw her?
12    A.  That would have been part of my physical
13  assessment, yes.
14    Q.  Did you relate that to Nurse Pinkerton?
15    A.  Yes.
16    Q.  Okay.
17    A.  I was like I haven't had a chance to do
18  Dopplers, vitals.  I got her urine.  She's trying to
19  change into a gown for further assessment.
20    Q.  Okay.  Did Nurse Pinkerton say that she was
21  going to perform a Doppler study on --- on Dr. Rumman to
22  check for the baby's heart rate?
23    A.  I do not remember.
24    Q.  What do you remember Nurse Pinkerton telling

14 (Pages 50 to 53)

## KENNETH T. LARSEN, JR., M.D.

HUNGRY HILL FARM
10599 WARLAND ROAD
MARSHALL, VA. 22115

### CURRICULUM VITAE

### PERSONAL

**Date of Birth:**        July 30, 1944

### EDUCATION

**High School:**        Graduate 1962
Piscataway Township High School
Piscataway New Jersey

**College:**        Graduate 1966
Rutgers University (New Brunswick, N.J.)
Honors in Major
Henry Rutgers Scholar

**Medical School:**        Graduate 1970
Georgetown University Medical School
Washington, D.C.

**Internship:**        Completed 1971
Straight Medical



PLAINTIFF'S
EXHIBIT
3

## Page 2

## SERVICE

**United States Army Medical Corps:** 1971-1973
1 1/4 Years Dewitt Army Hospital
3/4 Year Surgeon Generals Office
Awarded two Army Commendation Medals

## CERTIFICATION

**Board Certification:** American Board of Emergency Medicine
June 27, 1980 (One of first 280 physicians
so certified)
Recertified 1990, 2000 and 2010
Fellow American College of Emergency
Physicians 1982-Present

**Specialty Societies:** Virginia Medical Society
Fauquier County Medical Society
American College Emergency Physicians
Charter Member
Served: Test Development Committee
Chair: Careers in Emergency
Medicine Section

## APPOINTMENTS

**Academic:** Clinical Assistant Professor
Georgetown University Medical School
1982-1995

Kenneth T. Larsen, Jr., M.D., FACEP, FAAEM
10599 Warland Road
Marshall, Virginia 20115

### QUALIFICATIONS:

I graduated from Rutgers University in 1966 with a B.A. Degree and from Georgetown University
Medical School in 1970 with an M.D. Degree. I did a straight medical internship at Georgetown from
1970 until 1971 when I was drafted into the United States Army. I practiced Emergency Medicine part
time and served in the Army Medical Corps full time for the next two years. Since discharge from the
service until the present, I have practiced Emergency Medicine. I became Board Certified in Emergency
Medicine in 1980, one of the first 280 physicians so certified. I have recertified in 1990, 2000 and 2010. I
am a Life Fellow of The American College of Emergency Medicine and a Fellow of the American Academy
of Emergency Medicine. I have held privileges in Emergency Medicine and practiced it in 5 hospitals in
Virginia, 1 hospital in the District of Columbia and three hospitals in Maryland. I have served as
Chairman of The Department of Emergency Medicine in one hospital in each Jurisdiction. I have
extensive clinical experience in the diagnosis and treatment of sepsis, estimating at least 50 cases yearly
over 42 years of clinical practice. I have supervised Emergency Nurses and I am familiar with the
Standard of Care applicable to Nurses preforming triage. I am familiar with the Standard of Care for
physicians treating sepsis.

### DOCUMENTS REVIEWED:

I have reviewed the following:

       1.) Medical Records of Shahnaz Rumman at Cabell Huntington Hospital 9/28-10/2/11;

       2.) Deposition of Nurse Whitney Pinkerton;

       3.) Deposition of Nurse Amanda Elswick;

       4.) Deposition of Nurse Y. Alexsis Daugherty;

       5.) Deposition of Nurse Brenda Brown;

       6.) Deposition of Dr. Jessica Granger;

       7.) Deposition of Dr. Christine Gutierrez;

       8.) Deposition of Dr. David Jude;

       9.) Deposition of Dr. Randy Kinnard;

      10.) Deposition of Dr. Fadi Alkhankan;

      11.) Deposition of Dr. Jennifer Confer;

      12.) Deposition of Dr. Hoyt Burdick;

      13.) Answers to Interrogatories of the Defendants;

      14.) Documents produced by Defendant Cabell Huntington Hospital

### EXHIBITS:

In addition to pertinent portions of the Medical Records, I may also use medical illustrations, texts or
drawings as exhibits.



PLAINTIFF'S
EXHIBIT
1

2

## BASIS AND REASONS FOR OPINIONS:

I have reviewed the documents listed above. I also rely on my experience in seeing thousands of sepsis patients similar to Dr. Rumman and on my education, continuing medical education, Emergency Nurse supervisory experience and training in Emergency Medicine, as reflected in my curriculum vitae, attached as Tab 1.

## FACTUAL BASIS FOR OPINIONS:

1.) Dr. Rumman was a 37 year old female who presented to Cabell Huntington Hospital 9/28/11 and was directed from the Emergency Department to Labor and Delivery Triage. She arrived there at 5:35 PM with a chief complaint of fever. She was triaged at 6:50 PM, about one and one-half hours later by Nurse Whitney Pinkerton, however no triage assessment appears in the chart and Nurse Pinkerton was unaware of the nationally recognized levels of triage. She was complaining of fever and vomiting, was noted to appear quite ill and to have temperature of 102.8 degrees, pulse rate of 120 and blood pressure of 91/67. Nurse Pinkerton informed first year Obstetrical resident Dr. Granger of these findings. Zofran and Tylenol were ordered, as well as lab work. At 7:53 PM, Nurse Pinkerton noted no fetal heart tones and notified third year Obstetrical resident , Dr. Gutierrez, who confirmed these findings at 8:02 PM and ordered a formal radiologic obstetrical sonogram to confirm fetal death. She was taken to radiology and returned at 9:25 PM with fetal death confirmed. At 10:18 PM she was examined by Dr. Jude, Obstetrical attending, who performed a pelvic examination which revealed bulging membranes and very foul smelling amniotic fluid. Antibiotics (clindamycin and gentamycin) were ordered. Misoprosotol was administered at 11:35 PM and Clindamycin was started at 11:37 PM. There is no Medical Record documentation of the administration of gentamycin prior to 6:17 am on 9/29. Because of deteriorating vital signs and of very abnormal lab values (white blood cell count of 1,800, lactic acid level 4.23), she was moved to the Intensive Care Unit. Her condition continued to deteriorate and she succumbed to septic shock on October 2, 2011.

2.) Written policy of Cabell Huntington Hospital is that only patients presenting with pregnancy related problems and a confirmed pregnancy of greater than 20 weeks gestation should be referred to the Labor and Delivery Department. Patients with less than 20 weeks gestation should be directed the Emergency Department in accordance with nationally accepted Standards of Care.

3.) Cabell Huntington Hospital has a computerized tool to help in the recognition of sepsis.

4.) Cabell Huntington Hospital has computerized order sets In place for the treatment of sepsis. These are based on the 2008 Surviving Sepsis Campaign suggestions.

## OPINIONS

I hold the following opinions to a reasonable degree of medical certainty. They may be modified by other information discovered as the case continues.

1.) On arrival to Cabell Huntington Hospital, Dr. Rumman had experienced fetal demise and was septic by criteria nationally accepted and recognized by that Hospital.

2.) On arrival at the Emergency Department of Cabell Huntington Hospital (sometime shortly before 5:35 PM ), Dr. Rumman should have been formally triaged in the

3

Emergency Department by the triage nurse and directed to the Emergency Department
for her care according to Cabell Huntington Hospital's written policies and in accordance
with the nationally accepted Standard of Care.

3.] If Dr. Rumman had been properly triaged into the Emergency Department, both sepsis
and fetal demise would have been promptly recognized by Emergency Physicians who,
operating within the accepted Standard of Care, would have initiated aggressive IV fluid
therapy coupled with prompt IV broad spectrum antibiotic therapy (such as is reflected
by the Cabell Huntington Sepsis First Hour order set) which would have successfully
treated Dr. Rumman's E. Coli infection. Obstetrical consultation would
have been obtained for the initiation of Misoprostol therapy and she would have been
admitted to the ICU after initial stabilization. She would have recovered uneventfully, as
the vast majority of appropriately treated patients with uncomplicated sepsis do.

4.) The Nurses in Labor and Delivery Triage failed to meet the Standard of Care by not
triaging a 17 week pregnant patient complaining of fever and nausea for about one and
one-half hours after she arrived. This breach caused a further delay in the treatment of
Dr. Rumman.

5.) Both Nurse Pinkerton and Dr. Gutierrez failed to meet the Standard of Care by not
promptly checking fetal heart tones. Dr. Gutierrez did not meet the Standard of Care by
not recognizing that this patient was septic by criteria and by not immediately involving
her attending physician, Dr. Jude. A prompt obstetrical exam, at this time, would have
confirmed the diagnosis of septic abortion and allowed earlier antibiotic treatment.

6.) Dr. Gutierrez also failed to meet the Standard of Care by failing to recognize that the
white blood cell count of 2,900 on blood drawn by order of Dr. Granger at about 7:00
PM, confirmed the diagnosis of sepsis.

7.) Laboratory data determined from blood drawn by order of Dr. Gutierrez at about the
time she saw Dr. Rumman confirmed that the sepsis which Dr. Rumman had on arrival
has progressed to severe sepsis. Severe sepsis has a significant (70%) survival rate when
treated appropriately. That was not done. Aggressive IV fluid therapy and antibiotics
were not ordered.

8.) Dr. Jude did not meet the Standard of Care by not intervening in Dr. Rumman's care
earlier with antibiotics and by not recognizing that she was septic by criteria. As a
result, Dr. Rumman's condition continued to deteriorate to the point that she went into
septic shock with multiple organ dysfunction prior to receiving any antibiotics.

9.) Dr. Rumman presented to Cabell Huntington Hospital before 5:30 PM with sepsis and
fetal demise, not a life threatening condition. Properly and expeditiously treated, she
would, far more likely than not, have survived. She was not treated for this easily
identified condition with an antibiotic which could control her E. Coli infection for the
next twelve hours. This failure caused her illness to progress to severe sepsis and then
to septic shock, because during this period of time the bacteria inside her body
approximately doubled every 20 minutes.

4

10.) All health care providers in this case failed to use a computer available sepsis identification tool which would have identified this problem.

11.) The breaches of the Standard of Care by Cabell Huntington Hospital, by and through the Emergency Department Triage Nurse, illustrated above, was a proximate cause of Dr. Rumman's death.

12.) But for the above breaches of the Standard of Care, Dr. Rumman would have had a greater than 26% chance of survival.

## PUBLICATIONS AUTHORED IN THE PRECEDING TEN YEARS

I have not published in the last ten years.

## COMPENSATION RATES

My fee for consultation, review, deposition and trial testimony is $350.00 per hour. There is a two hour minimum for deposition and a four hour minimum per half day of trial testimony. I charge $3500.00 per full day out of town. My charges for Deposition review, document review and report preparation in this case to date are $7630.00

## TESTIMONIAL HISTORY

See attachment 2

September 23, 2014

Kenneth T. Larsen, Jr., FACEP, FAAEM

## DANIEL L. SELBY, MBA, CPA, CFF, CVA

### 23 Chase Drive

### Hurricane, West Virginia 25526

Telephone: (304) 562-5611
Email Address: dselby3723@aol.com

*Specializing in Forensic Accounting Litigation Support Services Associated with Civil and Criminal Litigation Along With Regulatory Proceeding in the Insurance and Public Utility Fields*

**Education:**

B.A. Business Administration, 1975, Otterbein University, Westerville, Ohio

M.B.A., Master of Business Administration, 1977, West Virginia University, Morgantown, West Virginia

**Professional Designations:**

Certified Public Accountant, WV (CPA), 1981, / Issued By The WV Board of Accountancy.

Certified Valuation Analyst, (CVA), 1997, / Issued By The National Association of Certified Valuators and Analysts.

Certified in Financial Forensics (CFF), 2008, / Issued By The American Institute of Certified Public Accountants.

**Litigation Experience:**

Public Utility Litigation / Regulatory Proceedings, Maine, South Carolina, Pennsylvania, Florida, Colorado, Washington, DC, Nebraska, Texas, Wisconsin and West Virginia / Tax, Rate of Return, Cost of Service and Accounting Issues, Revenue Requirement Issues for Public Utilities, Insurance Company Rate Determinations and Health Insurance Company Revenue Requirement Litigation, Consultant, 1979-1995.

Related Employment: WV Department of Insurance, WV Public Service Commission, Charleston, WV; J.W. Wilson & Associates, Washington, DC



PLAINTIFF'S EXHIBIT
4



**Financial and Economic Consulting**

Richard J. Lurito, Ph.D.
*President*

## CURRICULUM VITAE

Richard J. Lurito, Ph.D.
1491 Chain Bridge Road, Suite 300
McLean, Virginia 22101
Telephone: 703/442-4528          Telecopier: 703/893-1674
E-mail: rline5@verizon.net
September, 2013

### Education:

University of Illinois, B.A. (Economics), 1958. Double degree in Languages.
Georgetown University, M.A. (Economics), 1963.
Georgetown University, Ph.D. (Economics), 1969.

### Awards:

Georgetown University Fellow, 1960-1961.
Relm Foundation Fellow, 1961-1963.
H.B. Earhart Fellow, 1963-1965.
American Enterprise Institute Fellow, 1965-1967.

### Employment:

Commonwealth Consulting Group, Inc., McLean, Virginia:
     Senior Economist and President, October 1972 to present.
RL, Inc., McLean, Virginia:
     Economist and President, November 1981 to present.
General Services Administration:
     Acting Economic Counselor, February 1972 to October 1972.
     Deputy Economic Counselor, July 1971 to February 1972.
Georgetown University:
     Professorial Lecturer, 1973-1976.
     Assistant Professor, Economics, 1969-1973.
     Statistics Laboratory Instructor, 1960-1962.

### Consulting:

Stitt & Hemmendinger, Attorneys at Law, 1961-1962.
U.S. - Japan Trade Council, 1961-1962.

## Rod Gaston

| | |
|---|---|
| **From:** | Rod Gaston |
| **Sent:** | Friday, October 31, 2014 12:05 PM |
| **To:** | 'Anne O'Hare'; Julie A. Mullen |
| **Cc:** | Rebecca C. Brown; D.C. Offutt; Ashley Alberi; Samantha Harbeson |
| **Subject:** | RE: Rumman matter/ Deposition Dates for Dr. Richard Lurito, economist |

Anne:

Thanks.

Then I will not spend any more energy on the economists' deposition dates.

Rod

Rodney M. Gaston, Esq
Miller & Zois, LLC.
7310 Ritchie Highway
Suite 1001
Glen Burnie, MD 21061
(p) 410-553-6000
(f) 410-760-8922
rodgaston@millerandzois.com
www.millerandzois.com

**From:** Anne O'Hare [mailto:alohare@onblaw.com]
**Sent:** Friday, October 31, 2014 11:51 AM
**To:** Rod Gaston; Julie A. Mullen
**Cc:** Rebecca C. Brown; D.C. Offutt; Ashley Alberi; Samantha Harbeson
**Subject:** RE: Rumman matter/ Deposition Dates for Dr. Richard Lurito, economist

Rod:
I don't think so. If D.C. decides otherwise, I will let you know.

Anne Liles O'Hare, Esquire
Offutt Nord Burchett, PLLC
P.O. Box 2868
949 Third Avenue, Suite 300
Huntington, WV 25728-2868
PH: (304) 529-2868
FX: (304) 529-2999
alohare@onblaw.com





*This e-mail message and any attachments are from the law firm of Offutt Nord Burchett, PLLC and are intended solely for the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient of this communication or the employee or agent responsible for delivering the message to the intended recipient, or if it has*

*been sent to you in error, please notify the sender immediately. Do not examine, review, use, disclose, deliver, distribute, reproduce or take any action in reliance on it and immediately delete the message and any attachments.*

---

**From:** Rod Gaston [mailto:RodGaston@millerandzois.com]
**Sent:** Friday, October 31, 2014 10:36 AM
**To:** Anne O'Hare; Julie A. Mullen
**Cc:** Rebecca C. Brown; D.C. Offutt; Ashley Alberi; Samantha Harbeson
**Subject:** RE: Rumman matter/ Deposition Dates for Dr. Richard Lurito, economist

Thanks Anne.

Becky, do you need to depose Dr. Lurito?

While we are on the subject of the economists' depositions do either of you want to depose Dan Selby?

Thanks

Rodney M. Gaston, Esq
Miller & Zois, LLC.
7310 Ritchie Highway
Suite 1001
Glen Burnie, MD 21061
(p) 410-553-6000
(f) 410-760-8922
rodgaston@millerandzois.com
www.millerandzois.com

**From:** Anne O'Hare [mailto:alohare@onblaw.com]
**Sent:** Friday, October 31, 2014 8:49 AM
**To:** Rod Gaston; Julie A. Mullen
**Cc:** Rebecca C. Brown; D.C. Offutt; Ashley Alberi; Samantha Harbeson
**Subject:** RE: Rumman matter/ Deposition Dates for Dr. Richard Lurito, economist

Rod:
We do not wish to depose Dr. Lurito.

Anne Liles O'Hare, Esquire
**Offutt Nord Burchett, PLLC**
P.O. Box 2868
949 Third Avenue, Suite 300
Huntington, WV 25728-2868
PH: (304) 529-2868
FX: (304) 529-2999
alohare@onblaw.com



*This e-mail message and any attachments are from the law firm of Offutt Nord Burchett, PLLC and are intended solely for the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient of this*

communication or the employee or agent responsible for delivering the message to the intended recipient, or if it has
been sent to you in error, please notify the sender immediately. Do not examine, review, use, disclose, deliver,
distribute, reproduce or take any action in reliance on it and immediately delete the message and any attachments.

---

**From:** Rod Gaston [mailto:RodGaston@millerandzois.com]
**Sent:** Thursday, October 30, 2014 2:29 PM
**To:** Julie A. Mullen
**Cc:** Anne O'Hare; Rebecca C. Brown; D.C. Offutt; Ashley Alberi; Samantha Harbeson
**Subject:** Re: Rumman matter/ Deposition Dates for Dr. Richard Lurito, economist

To All

Dr. Lurito is available on dec 1, 2014, from 11:00am -3:30pm for his deposition. (fYi: I am not traveling to Va for this
deposition but will call in via regular phone line.)

Thanks

Rod Gaston

Sent from my iPad

## REPORT OF SHARON LEIGH GILLESPIE, RN, BSN, MSN

I am a Master's prepared Registered Nurse with over 30-years of health care administration, consulting and clinical experience in nursing. I received my undergraduate degree (BSN) from the University of North Carolina at Charlotte in 1983 and my graduate degree (MSN) from Bellarmine University in 1992. I have held Director of Women's and Children's Services positions in West Virginia, Georgia, Florida and Maryland. I have extensive knowledge of the Joint Commission, American College of Obstetricians and Gynecologist, Association of Women's Health, Obstetric and Neonatal Nurses Standards of Care. I am also familiar with the West Virginia Hospital Licensure Rules (Title 64 - Series 12).

I have served as a Nursing Expert Witness for cases in Florida, Georgia, Kentucky, Ohio, West Virginia and the District of Columbia. To the best of my recollection I have not provided trial or deposition testimony in the last four years. I was retained by Miller and Zios, L.L.C. law firm in April 2013 to review the care provided to Shahnaz Rumman at Cabell Huntington Hospital from her time of admission on September 28, 2011 until her untimely demise on October 2, 2011. My fee for record review is $150/hour, $300/hour for deposition and $3200/day for trial testimony. My charges for review, attending depositions and preparation of this report total $5250.

Through my education and training and professional activities I am familiar with the standard of care as it pertains to the care of Obstetrical patients in West Virginia and am familiar with the standard of care as it existed in 2011 when Dr. Shahnaz U. Rumman was a patient at Cabell Huntington Hospital (CHH). I have reviewed the medical records and charting relating to the treatment and care of Dr. Rumman. I have attended the depositions of Jennifer Confer, Amanda Elswick, Whitney Pinkerton and Brenda Brown and I have read the depositions of Lisa Midkiff, Y. Alexis Daugherty, RN, Dr. Christine Gutierrez, Dr. Jessica Granger, Dr. David Jude, Dr. Randy Kinnard and Dr. Hoyt Burdick, In addition, I have reviewed Cabell Huntington Hospital written policies and the West Virginia Hospital Licensure Rules which pertain to Dr. Rumman's care.

Dr. Rumman is a 37-year old female G5P1, EDC 3/4/2012 who presented to the OB Triage area at CHH on 9/28/2011 with complaints of new onset of fever, headache and vomiting. She was 17.3 weeks at the time. Her vital signs at 19:03 were temperature 102.8 (oral), blood pressure 91/67, heart rate 120, and respirations 16. She received a single dose of 1000mg Tylenol at 19:32 and at 20:30 her temperature had decreased to 100.4. At 19:40 the Triage nurse attempted but was unable to obtain fetal heart tones (FHTs). Dr. Gutierrez (OB resident on duty) was called to the bedside and she was unable to visualize FHTs. An "official" ultrasound (US) was ordered and the patient was transported to Radiology via wheelchair where a US confirmed fetal demise. Dr. Jude (attending OB) performed a sterile speculum exam at 22:00 and noted that both the Fern and nitrazine tests were (+) indicating that her membranes had broken. Laboratory test results at 22:25 showed the WBC = 1.4, Lactic Acid = 4.23 and K+ =



PLAINTIFF'S EXHIBIT
6

2.7. At 22:26 orders were placed by Dr. Gutierrez for Gentamicin 110mg IVPB every 8-hours and Cindamycin 900mg IVPB every 8-hours.  Y. Alexis Daugherty, RN documents in the MAR that she gave the Clindamycin at 12:09AM on 9/29/2011; however, the OB Flow Sheet indicates Clindamycin was given at 23:35 on 9/28/2011. Gentamicin administration is not documented until 06:16AM on 9/29/2011 by Brenda Brown, RN.

The patient was transferred to LDR at 22:33. On admission to LDR the nurse notes that Dr. Rumman is alert and oriented X3 with respirations even and unlabored.  Misoprostol (Cytotec) is placed vaginally by Dr. Gutierrez at 23:35.  At 23:50 Dr. Gutierrez spoke to the patient and her family members about transferring her to SICU. She was transferred to SICU at 12:15AM on 9/29/2011. Dr. Rumman vaginally delivers a stillborn male infant at 02:36 followed by placenta delivery at 02:57.

Dr. Randy Kinnard assumes care of the patient in the ICU.  He charts that the patient has been transferred to ICU at the OB's request due to the patient having hypotension. In his "Assessment and Plan" dated 9/29/2011 Dr. Kinnard notes that the patient is septic and that her hypotension is secondary to sepsis. Gentamicin and Clindamycin had been ordered and he adds Ampicillin 2000mg IVPB every 4 hours - with the first dose given by Brenda Brown, RN at 02:46AM. Dr. Rumman's clinical status deteriorates significantly during the night and at 08:41 that morning she is intubated due to respiratory distress. Dr. Fadi W Alkhankan, Pulmonologist, sees Dr. Rumman on 9/29/2011 and notes that the patient has acute respiratory failure due to refractory septic shock, DIC, severe acidosis and AKI (Acute Kidney Injury).  Dr. Rumman died on October 2, 2011.

I believe that deviations from the standard of care for reasonably prudent nurses occurred on behalf of the nursing staff.  These deviations are based upon my experience and education and training along with the guidelines set forth by the Joint Commission, Title 64: Series 12 West Virginia Division of Health Hospital Licensure Rule and Cabell Huntington Hospital written policies.  I have the below opinions to a reasonable degree of probability in the field of Nursing care:

1.    The standard of care required Dr. Rumman be triaged and cared for in the Emergency Room. The ER triage nurse, not yet identified, breached the standard of care by directing Dr. Rumman to the OB Triage unit. The ER triage nurse also breached the standard of care and violated hospital policy by not triaging Dr. Rumman in the ER and by failing to refer her to an ER physician for treatment.

2.    Dr. Rumman was 17.3 weeks pregnant and had an elevated temperature of 102.8. Allowing her to remain in Labor & Delivery with an elevated temperature is a violation of West Virginia Law. All nurses at Cabell Huntington Hospital are required to follow West Virginia law and this failure to do so is a breach of the standard of care.

4.   Dr. Rumman was exhibiting signs of sepsis at the time of her admission to OB Triage.

5.   All patients are required to be treated equally regardless of their physician affiliations. Dr. Rumman in fact was treated differently because of her physician affiliation which is in violation of the Joint Commission standard LD.04.03.07.

6.   The standard of care required by Nurse Brown was to administer Gentamicin to Dr. Rumman on a STAT basis as soon as she assumed care of the patient. According to the medical records the first dose of Gentamicin was not administered until 06:17AM on 9/29/2011 and in clear breach of the standard of care.

7.   The standard of care required that Dr. Rumman be promptly triaged and assessed upon her arrival in the OB Triage unit. The 1.5 hour delay for the nursing assessment of Dr. Rumman was a breach of the standard of care. It was also a breach of the standard of care for Nurse Pinkerton to fail to perform a triage assessment.

8.   There is no level of triage assigned to Dr. Rumman which is a breach in the standard of care by Nurse Pinkerton. Nurse Pinkerton was unaware of the West Virginia law with respect to the levels of triage for hospital patients such as Dr. Rumman.

9.   The standard of care for Dr. Rumman was to have a prompt ultrasound to confirm fetal heart tones. The 2.5 hour delay before the FHT assessment was conducted is a breach of the standard of care.

10.  The standard of care requires a nurse in Labor and Delivery, which includes Nurses Pinkerton, Elswick and Daugherty to notify the Pharmacy of Dr. Rumman's transfer to ICU. This was not done and this failure is a breach of the standard of care.

Based upon all of the foregoing, it is my opinion that the placement of Dr. Rumman to OB Triage and Labor & Delivery was a breach of the standard care and the consequences of this action resulted in a significant delay of treatment. I hold all of my opinions with a reasonable degree of medical probability.


X _____ RN

Sharon Leigh Gillespie, RN

Richard Brandon Frady, MSN, RN, ACNP-BC, CMC
2201 Fellowship Court
Tucker, Georgia 30084

Qualification:

I have been a registered nurse for 18 years and 4 months as of October 2014. I graduated in 1996 from Presbyterian Hospital School of Nursing with a Diploma in Nursing and then in 2006 from Emory University with a Master's of Science in Nursing with a specialization in Critical Care. My career has encompassed direct clinical care of critically ill patient, clinical nursing management of critical care environment including medical, surgical, neurological, and obstetrical critical care, finally I have functioned as a clinical nurse specialist for critical care and cardiology. My most recent practice in critical care is as Critical Care Nurse practitioner caring for critically ill medical, surgical, and obstetrical patient population. I have extensive knowledge of the standards of practice set forth by the American Association of Critical Care Nurses.

List of Documents / Materials Reviewed:

1) Cabell Huntington Hospital, Inc. Medical Record for Dr. Shahnaz Rumman
2) Gentamicin Dispensing Report
3) Cabell Huntington Live Directory Report
4) Notice of Claim- Date: 08/23/2013
5) Certificates of Merit – Date: 08/23/2013
6) Amended Complaint – Date: 05/29/201
7) Answers to Amended Complaint 06/12/2014
8) Expert and Disclosures – Date: 09/25/2014
9) Lisa Midkiff – Pharmacist – Date: 09/17/2014
10) Brenda Brown – Registered Nurse – Date: 09/12/2014
11) Title 19 Legislative Rule Board of Examiners For Registered Professional Nurse Series 10
12) Whitney Pinkerton – Registered Nurse – Date: 09/12/2014
13) Jennifer Confer – Pharmacist – Date: 09/12/2014
14) Dr. David Jude – Physician – Date: 09/10/2014
15) Dr. Randy Kinnard – Physician – Date: 09/10/2014
16) Y. Alexis Daugherty – Registered Nurse – Date: 09/12/2014
17) Dr. Jessica Granger – Physician – Date: 09/10/2014
18) Amanda Elswick – Nursing – Date: 09/12/2014
19) Dr. Hoyt Burdick – Physician – Date: 09/12/2014
20) Dr. Christine Gutierrez – Physician – Date: 09/15/2014
21) Rubina Ahmed - Date: 08/04/14
22) Kazi Hossain – Date: 08/14/2014

Summary of Events:

Dr. Rumman a 37 year old female presented to the emergency department at Cabell Huntington Hospital and was directed to the obstetrical triage unit. She had complaints of fever, headache, and vomiting. Her initial vital signs were: temperature 102.8 orally, heart rate 120 beats per minute, systolic blood pressure 91 mmHg and diastolic blood pressure 67 mmHg. At 19:53 on 09/28/2011; during the triage process fetal heart tones were assessed and were not obtainable by Doppler. A fetal ultrasound

PLAINTIFF'S
EXHIBIT
7

was ordered and completed and Dr. Rumman was found to an intrauterine fetal demise. An obstetrical / gynecological (OB/GYN) consult was requested and completed for dilation and evacuation of fetus related to septic abortion. Dr. Rumman was transferred to the Labor and Delivery unit at 22:33 on 09/11/2011. Dr. Rumman continued to have elevated heart rate, low blood pressure, and elevated lactate. She was started on antibiotics 09/28/2011 at 23:30. She was transferred to the intensive care unit (ICU) 09/29/2011 at 00:15. On arrival to ICU she continued to have alterations in her vital signs heart rate 132 beats per minute, respiratory rate of 28 breaths per minute, systolic blood pressure 72 mmHg, diastolic blood pressure 40 mmHg, mean arterial pressure 51mmHg, and elevated lactate 4.23. Her initial nursing assessment on arrival to the ICU demonstrated a restless patient with blue dusky skin, thread 1+ pulses in posterior tibial and dorsalis pedis, and moderate agitation. Additional on arrival to the ICU the nurse placed additional intravenous lines to facilitate care that was ordered by the physician. She was given multiple medications to stabilize her including antibiotics, intravenous fluid administration per physician orders. Despite the maximal care provided Dr. Rumman continued to deteriorate and required intubation at 07:20 on 09/29/2011. She was started on norepinephrine infusion for blood pressure (09:55 on 09/29/2011), vasopressin (09/29/2011 13:02), and neosynephrine (09/29/2011 16:04). Over the next 4 to 5 days she continued to require multiple medications to support her blood pressure. Also she required continuous renal replacement therapy. On 10/02/2011 she developed pluseless electrical activity and required cardiopulmonary resuscitation on two separate occasions. During the second resuscitation attempt Dr. Rumman did not have a return of spontaneous circulation and was pronounced dead 10/02/2011 at 13:22.

Basis and Facts for Opinions:

I have reviewed the listed documents above. I also rely on clinical critical care experience and education and training of sepsis patient admitted to the critical care unit comparable to Dr. Rumman.

Opinions:

I hold the following opinions to a reasonable degree of nursing certainty. They may be modified by additional information discovered as the case continues.

1) Nursing care rendered in the ICU was consistent with standards of care for sepsis patients. Additional intravenous lines were established upon Dr. Rummans arrival to the ICU in anticipation of multiple antibiotics and other medications as ordered by the physician. The nursing staff demonstrated care planning and anticipation of implementation of needed medical strategies to support Dr. Rumman during her admission to the ICU as ordered by the physician.

2) Additionally, I am of the opinion that the nursing care meet the standard of care in accordance with the Surviving sepsis campaign (2008 recommendations) as evidence by frequent nursing assessments , vital signs, laboratory / diagnostic studies as ordered by the physician, and immediate interventions to ensure safe care to stabilize Dr. Rumman.

3) The standard of nursing care set forth in the West Virginia standards for professional nursing practice was met and exceeded on the care of Dr. Rumman.

Publications in Last Ten Years:

I have not published in last ten years.

**Compensation Rates:**

    See Attachment **1**

**Testimony History:**

    I have not provided testimony, depositions, or opinions in the last four years.

Richard Brandon Frady

11 / 1 / 2014

Date

FRANCILLA A. THOMAS, RNC-OB, MSN, C-EFM

64 TREMONT TERRACE

WANAQUE, N.J. 07465

I am a Master's prepared Registered Nurse with over 25 years of clinical experience in Obstetrical Nursing.

I have served as a Nursing Expert Witness for cases in Maryland, Chicago, Atlanta, Kansas City and Houston Texas. To the best of my knowledge I have not provided trial or deposition testimony in the last four years.

I have been retained by Bailes, Craig & Yon, PLLC to review the nursing care provided to Dr Shahnaz Rumman from her admission to OB Triage to her admission to the Intensive Care Unit.

I have read the depositions of Whitney Pinkerton, Amanda Elswick, Brenda Brown, Y. Alexis Daugherty, Jennifer Confer, Lisa Midkiff and Doctors Christine Gutierrez, Jessica Granger, David Jude, Randy Kinnard and Hoyt Burdick. I have also reviewed the medical records and charting of treatment and care rendered to Dr Shahnaz Rumman.

Dr Rumman was a 37 yr old G5 P1031 with an EDC 3/4/12 who came to the OB Triage on 9/28/11 with chief complaint of fever, she had a gestational age, at that time, of 17 weeks 3 days. Documentation showed that at 18:38 Dr Rumman was shown to a triage room and instructed on gown placement and clean catch urine collection, this was documented as being sent to the lab at 18:49 for urinalysis. At 18:50 vital signs were taken showing T102.8 [oral], HR 120, Resp 16, BP 91/67. Documentation by the Triage Nurse at this time showed not only was the patient complaining of fever but a headache also and stated she took Tylenol that morning, the Nurse further documented the patient's denial of any abdominal pain, loss of fluid or vaginal bleeding and Dr Granger was notified. 19:40 an IV was started and Lactated Ringers hung, blood drawn and sent to the lab.



Documentation also showed she received Tylenol 1000mg po at 19:30 and Zofran 4mg IVP at 19:43

19:53 the Triage Nurse unable to obtain Fetal Heart Tones with Doppler informed Dr Gutierez who performed a bedside ultrasound at 20:02 and was unable to visualize FHT and ordered an official ultrasound. At 20:40 Dr Rumman was taken to Ultrasound where a demise was confirmed and returned to Triage at 21:15, Dr Gutierrez was notified of her return. 22:00 Drs Jude and Gutierrez at bedside discussing plan of care and 22:18 sterile speculum exam was done, notes indicated (+) fluid in the vagina (+) foul smell (+) nitrazine (+) fern and a 3cm dilated cervix.

Of note when Dr Rumman was seen by Dr Gutierrez, she complained of emesis since 15:00 and stated she felt she had an episode of fluid leaking briefly the day before.

At 22:26 orders were placed by Dr Gutierrez for Gentamicin 110mg IVPB Q8H and Clindamicin 900mg IVPB Q8H. Documentation in the MAR shows Clindamicin was given by Y. Alexis Daugherty RN at 23:30 on 9/28/11 and charted at 00:09 on 9/29/2014. Gentamicin is not documented until 06:17 on 9/29/11 by Brenda Brown RN.

At 22:33 orders were received to transfer patient to LDR and patient was transferred at 22:47. On admission to LDR the nurse noted Dr Rumman to be alert and oriented x 3, respirations even and unlabored, no SOB, or chest pains, IV infusing as ordered and several family members at bedside. At 23:25 she is up to the bathroom, at 23:35 Misoprostol 200mcg inserted per vagina by Dr Gutierrez. At 23:50 Dr Gutierrez discussing with patient and family move to SICU, telephone report was given at 00:05 and patient was transferred at 00:15.

I believe that the standard of care for reasonably prudent nurses was met by the nursing staff.

1. Dr Rumman presented to OB Triage and was admitted, as per admitting office, at 6:25pm and within 25 minutes was shown to a triage room by a

nurse and had a nursing assessment done which entailed getting a history, taking her vital signs and obtaining a specimen of urine for urinalysis

2. Standard of care was met when the Triage Nurse, in a timely manner, notified the physician about the patient's admission to triage.

3. Standard of care was met when the Triage Nurse implemented the orders to address the patient's immediate needs i.e. starting an IV, administering Tylenol and Zofran as ordered.

4. Standard of care was met when the Triage Nurse used her nursing judgment and prioritized care for her patient i.e it was more prudent to address the elevated temperature and vomiting of Dr Rumman at that time than trying to find Fetal Heart Tone on a 17 week gestational patient who is vomiting.

5. The LDR Nurses administered the antibiotic Clindamicin as soon as the order was received and the medication became available

6. Nurse Brown testified in her deposition to remember removing the empty Gentamicin bag before hanging the dose at 06:17, and although she may have forgotten to chart the medication, she testified to what is her practice.

It is my opinion that the OB Triage and LDR Nurses did what any prudent and reasonable nurse would do under the same or similar circumstances

*JAThomas RNC*

October 31, 2014

Ms. Rebecca Brown
Bailes, Craig & Yon, PLLC
401 10th Street, Suite 500
P.O. Box 1926
Huntington, WV 25720-1926

Re: Rumman

Dear Ms. Brown:

At your request I have reviewed the following documents as it relates to the care of Dr. Rumman during her 9/28/11-10/2/11 hospitalization at Cabell Huntington Hospital. I have confined my review in order to offer opinions as it relates to nursing care and hospital policy to causation.

1. Admission sheet
2. Plaintiff's Expert Witness Disclosure and Supplemental Disclosure
   a. Kenneth Larson, MD
   b. William Roberts, MD
   c. James Leo, MD
   d. Richard Beigi, MD
   e. Richard Lurito
   f. Debra Spicehandler, MD
3. Depositions
   a. Christine Gutierrez, MD
   b. Dr. Hoyt Burdick
   c. Amanda Elswick
   d. Whitney Pinkerton
   e. Jennifer Confer
   f. Alexis Daugherty
   g. Brenda Brown
   h. Rubina Ahmed
   i. Kazzi Hossain
   j. Lisa Midkif
4. Cabell Hospital ED Identification and Care of Sepsis
5. Hard Copy Sepsis Computerized Order Entry Set
6. Tip of the Week—Sepsis Alert for Inpatient Adults
7. "Shock States" Document
8. Defendant David C. Jude, MD's Answers to Plaintiff's interrogatories
9. Responses to Plaintiff's Interrogatories by Defendant Brenda Brown
10. Timeline from Ms. Brown

Dr. Rumman arrived at Cabell Huntington Hospital at 1825 by admission records on September 28, 2011 and was sent to OB Triage where she was seen shortly thereafter by the nurse who took vital signs, rendered an assessment, and notified Dr. Granger. Vital signs were temp 102.8, heart rate 120, respiratory rate 16 and blood pressure 91/67. Dr. Granger was on a shift that ended at 1900. Dr. Granger ordered lab with results at 1917 showing a WBC 2.9. The nurse could not find fetal heart tones during an

PLAINTIFF'S
EXHIBIT
9

Ms. Rebecca Brown
Bailes, Craig & Yon, PLLC
October 31, 2014
Page 2

ultrasound exam at 1953. Dr. Gutierrez was notified and confirmed bedside US findings and sent patient to Radiology for definitive diagnosis of fetal demise. Dr. Gutierrez ordered additional lab, which was available at 2141 and revealed WBC 1.4, K+ 2.7, Bicarb 16, Anion gap 16, Albumin 3.4, lactic acid 4.23. Dr. Jude the attending physician saw Dr. Rumman around 2220 hours where a GYN exam found the cervix to be dilated 3 cms with membranes bulging. His impressions were chorioamnionitis, intrauterine fetal demise and sepsis. His plan was intravenous antibiotics and uterine evacuation. The patient was transferred to Labor and Delivery around 2245. Vital signs at 2331: HR 115, BP 117/51. Clindamycin was begun shortly before transfer to SICU. Vital signs at midnight were T 99.7, HR 132, BP 72/40. Patient was transferred to the SICU shortly after midnight. A new IV was placed in the SICU. There is no chart documentation of Gentamycin being given (it was ordered), but nurse testimony is that the Gentamycin would have been given shortly after the new IV was placed.

Following misoprostol administration a spontaneous vaginal delivery of a still-born male fetus occurred at 0236 hours. Ampicillin was begun at 0246. Gentamycin was given at 0617. The patient had received 1000 cc of lactated ringers which were ordered by the initial resident contact, Dr. Granger, and another liter was stated at 0159. Additional fluid was administered during the early morning hours. Blood cultures drawn late on 9/28/11 grew E. Coli resistant to ampicillin but sensitive to Gentamycin. She had a progressive downhill course in the ICU with severe sepsis, septic shock and multiple organ failure. She died on 10/2/2011.

Dr. Rumman met diagnostic criteria for severe sepsis at 2141 with the return of a lactic acid value of 4.23. She also met criteria for sepsis induced hypotension at midnight.

Numerous plaintiff complaints have been leveled concerning timely assessment and timely treatment as it relates to nursing responsibilities. I have the following opinions related to these criticisms and also as it relates to causation.

1. The assessment by the nurse following arrival at the hospital and notification of physician occurred in a timely fashion.

2. Much attention has been directed toward an earlier diagnosis and antibiotic treatment of severe sepsis. Assuming Gentamycin was given shortly after the second IV was started, antibiotics were delivered in a timely fashion following the diagnosis of severe sepsis and met standard of care.

3. Had fetal heart tones been assessed earlier in OB Triage it would not have effected outcome in this case.

4. Had the patient been managed in the Emergency Department as opposed to OB Triage and Labor and Delivery, outcome would have been no different.

5. In summary no act of commission or omission by the nurses would have altered the outcome in this patient (this does assume Gentamycin was given shortly after arrival in the SICU).

Ms. Rebecca Brown
Bailes, Craig & Yon, PLLC
October 31, 2014
Page 3

My opinions to date are to a reasonable degree of medical probability based on materials I have thus far
reviewed in this matter and could change with review of additional materials.

Sincerely,

R. Phillip Dellinger, MD
Professor and Chair of Medicine
Cooper Medical School of Rowan University
Senior Critical Care Attending
Medical Director, Adult Health Institute
Cooper University Hospital

1) I am a licensed physician actively practicing medicine in the state of Kentucky. I received my medical degree from the University of Kentucky College of Medicine in 2003. I completed a residency in emergency medicine at the University of Kentucky from 2003-2006. I am board certified in emergency medicine by the American Board of Emergency Medicine since 2007. I have been practicing emergency medicine for over 8 years.

2) I have reviewed the medical records from the visit of Shahnaz Rumman from Cabell Huntington Hospital.

3) Based upon my training and expertise in emergency medicine, I am familiar with the standard of care for triage of emergency medicine patients including those with obstetric emergencies.

4) Based upon my education, training, expertise, familiarity with standard practices at academic hospitals, and my review of the patient chart, I do not believe that the staff at Cabell Huntington Hospital deviated from the standard of care in their designation of Shahnaz Rumman as most appropriate for emergency care at the obstetric triage area of the hospital.

5) The opinions expressed above are to a reasonable degree of medical probabilty that this was not a deviation of the standard of care. The opinions are based wholly upon the materials available to me at the time I performed my review of this matter. I reserve the right to review any documents or materials which may be later generated and/or supplied to me and supplement or amend the above opinions as might be appropriate, in my professional opinion.

6) I do not have a financial interest in the outcome of this litigation.


Brian Adkins MD



PLAINTIFF'S
EXHIBIT
tabbies®
10

Report of Dr. Richard H. Beigi, MD, MSc.

Re: The Estate of Dr. Shahnaz Rumman

Prepared and finalized on September 22, 2014.

Dear Mr. Gaston,

I was asked in December, 2013 to review the case of Dr. Shahnaz Rumman with attention to the care provided during her presentation and subsequent demise shortly thereafter at Cabell Huntington Hospital in September, 2011.

I am a board-certified Obstetrician-Gynecologist practicing in the large academic tertiary care center known as Magee-Womens Hospital of the University of Pittsburgh School of Medicine. After my residency training in Obstetrics and Gynecology I entered and successfully completed a fellowship in Reproductive Infectious Diseases (Infectious Diseases of the Female Reproductive Tract). I finished my fellowship training in 2003 and since have been actively practicing in the field of reproductive infectious diseases as well as general obstetrics and gynecology. My areas of expertise include female genital tract infections in pregnancy as well as in non-pregnant women. Given my specialty training and experience I am commonly asked to offer clinical opinions on like cases and provide expert clinical consultation on many women with similar life-threatening conditions. I note that there are numerous areas in this case that are suboptimal and directly contributory to the adverse outcome. I am familiar with the standard of care for ob-gyn physicians such as Dr. Gutierrez and Dr. Jude and nurses such as Brenda Brown for the care and treatment of septic patients such as Dr. Rumman.

It is with this background of specialty training, accumulated knowledge, and clinical expertise that I offer objective opinions in the care of Dr. Rumman in September, 2011. The conclusions in my report are based on my clinical experience over the past 17 years, review of the medical records, the answers to interrogatories, and the depositions of the following persons: Dr. Christine Gutierrez, Dr. Fadi Alkhankan, Dr. David Jude, Dr. Jessica Granger, and Dr. Randy Kinnard, Nurse Brenda Brown and Nurse Whitney Pinkerton.

Dr. Rumman was herself a 37-year old physician, practicing Internal Medicine in West Virginia. She was pregnant with her second child (via an IVF pregnancy) and was a mother to a 7-year old son. Her pregnancy was seemingly uncomplicated up until the point of presentation to Cabell Huntington Hospital on September 28, 2011, when she was approximately 17 weeks pregnant. After working earlier in the day on the 28th, she presented to Cabell Huntington hospital and was seen in the Obstetrical Triage area with the complaints of fevers, chills, vomiting, and leaking of amniotic fluid. This occurred at approximately 5-5:30PM on the 28th.



The medical records demonstrate that although she had clear signs of systemic inflammatory response syndrome (SIRS) and sepsis (with an elevated temperature, elevated pulse, and strikingly low white blood cell count) she was not fully evaluated and did not have a comprehensive plan of care established until 10:30PM by an attending physician (Dr. Jude). Importantly, it appears that even the standard core evaluation of fetal viability via Doppler assessment (which failed to detect fetal heart tones) did not occur until after Dr. Rumman had been in the obstetrical unit for approximately 2 hours. Given her rapidly deteriorating state as demonstrated by the combination of her clinical presentation, unstable and rapidly worsening vital signs, (including high fever, tachycardia, and hypotension), leukopenia (1st 2.9K, then 1.4K) and eventual demonstrated fetal demise, this timeline of her evaluation and management falls well below the standard of care for evaluation and management of a patient with signs and symptoms consistent with SIRS/sepsis. A reasonable timeline for assessment and plan development in such a patient is within 2-2.5 hours of presentation. In this situation it took 5 hours. This delay by Dr. Gutierrez and Dr. Jude was a breach in the standard of care and was a proximate cause of Dr. Rumman's death.

It has been demonstrated that delay (as seen in this case) in the initial diagnosis for patients who develop septic shock (as Dr. Rumman did) is a powerful predictor of poor outcomes. Further, every hour of delay in the administration of appropriate antibiotic therapy in the management of septic shock correlates to an additional 7.6% lower overall survival, likely due to unchecked exponential growth and systemic spread of bacteria. Additionally, and as noted below, there was an unacceptably long delay in the administration of appropriate antibiotics in this case as well.

At this point (approximately 10:30 PM), although delayed and lacking the urgency required by the severity of the rapidly deteriorating clinical picture, the clinical team made an appropriate diagnosis and formulated a management plan to include broad-spectrum antibiotics and uterine evacuation. Dr. Rumman was already showing signs of labor with a 3 cm dilated cervix and leaking amniotic fluid and a course of action was undertaken with vaginal placement of misoprostol to hasten the uterine evacuation process. Additionally, a broad-spectrum antibiotic regimen was ordered (Gentamicin, Clindamycin). However, and most importantly, the key antibiotic required (Gentamicin) for the specific broadly-resistant bacteria isolated from nearly all pregnancy-related tissues and body fluid cultures (E. coli) from Dr. Rumman, was not given until approximately 6:15 am the following morning (9-29). To be clear E. coli is not a rare bacteria involved in pelvic infections. E. coli is one of the most common bacteria involved in complicated pelvic infections such as Septic Abortions (represented by this case) and contributes fundamentally to the clear recommendations for use of broad-spectrum antibiotics in serious pelvic infections.

The failure to administer the broad-spectrum antibiotic regimen ordered in a timely manner (within 1 hour of order placement, which was already delayed) represents a serious breach in the standard of care for which both the hospital as well as the physicians (Dr. Gutierrez and Dr. Jude) and the nurse (Brenda Brown) caring for Dr. Rumman are responsible. It has been well demonstrated that early and appropriate broad-spectrum antibiotic therapy in patients with septic shock decreases risk of mortality significantly.

Despite transfer to the intensive care unit and eventual delivery and uterine evacuation, Dr. Rumman continued to worsen and never recovered, eventually expiring shortly thereafter on October 2nd, 2011. The E. coli isolated from Dr. Rumman importantly was resistant to ampicillin (as are a high percentage of E. coli strains nationally) and thus effectively went untreated with appropriate antibiotics until the am of 9-29-11. This is an unnacceptably long delay in appropriate care and is well below the standard of care. Evidence of this unchecked infection also exists considering overwhelming growth of E. coli noted on the pathology report of Dr. Rumman's placenta, which was delivered prior to her receiving antibiotic therapy targeting E. coli (Gentamicin), "The findings are quite striking for the degree of chorioamnionitis as well as the profound amount of gram negative bacilli (which completely obscures the lumen of the fetal vessels within the placenta everywhere sampled) observed. These bacteria are morphologically and on gram stain consistent with the E. coli demonstrated in cultures from the patient". This is an unusual pathology report in that they specifically comment on the overwhelming amount of bacteria in and on the placental tissues (rarely see such commentary).

After thorough review of the case it is my objective opinion that the providers caring for Dr. Rumman from 9-28-11 through the early am of 9-29-11 (ie. Dr. Gutierrez and Dr. Jude) did not meet the standard of care in the management of this patient. They negligently allowed a clearly manageable non-life-threatening condition to develop into a life-threatening condition which resulted in Dr. Rumman's death. The providers and nurses involved in Dr. Rumman's care in the first 12 hours of her presence at Cabell Huntington did eventually make the correct diagnosis and management plan, although late. However, and importantly, collectively they failed to take the appropriate measures necessary to assure they had adequately and timely diagnosed and managed her life-threatening condition with the appropriate antibiotics and offer her and her husband hope of recovery. It is also my opinion that had the appropriate antibiotics been given to Dr. Rumman on the evening of 9-28-11 into the early am hours of 9-29-11 she more likely than not she would have survived. As this did not happen, she suffered an avoidable and tragic death relatively soon thereafter. It is also important to note that at no time did any of the purported statements or decisions made by Dr. Rumman about her own care negatively impact the eventual clinical outcome nor contribute to her death. It is also my opinion but for the breaches in the standard of care mentioned above Dr. Rumman would have had a greater than 26% chance of survival.

I charge $400.00/hour for case reviews and deposition preparations, depositions, and trial testimony (trial testimony comes to a full 8 hour day = $3,200.00). My charges for the review of the materials and preparation of this report total $8,600.00 (21.5 hours).

Respectfully submitted,

*Richard M. Beigi*

Richard H. Beigi, MD, MSc.
Associate Professor of Reproductive Sciences,
Division Director, Obstetrical Specialties,
Division of Reproductive Infectious Diseases and Immunology,
Department of Obstetrics, Gynecology, and Reproductive Sciences,
Magee-Womens Hospital of UPMC
Pittsburgh, PA 15213

**CURRICULUM VITAE**

**NAME:** William E. Roberts, M.D.     **DATE OF APPOINTMENT**
                                        **TO ERLANGER**
                                        **HEALTH SYSTEM**         August 2007

**TITLE:**                     Division of Maternal-Fetal Medicine
                             Department of Obstetrics and Gynecology

**LANGUAGE**
**PROFICIENCY:**      English

**EDUCATIONAL**
**BACKGROUND:**

      **Undergraduate:**     Auburn University               June 1970
                          Auburn, Alabama              B.S.
                          Graduated Magna Cum Laude

      **Graduate**
      **Study:**              University of Alabama         January 1974
                          School of Medicine          M.D.
                          Birmingham, Alabama

**POSTGRADUATE**
**TRAINING AND**
**EXPERIENCE:**             Internship (Rotating)        February 1974 -
                          Malcolm Grow Medical Center    January 1975
                          Andrews Air Force Base
                          Washington, DC

                          Internship (Straight Ob)       July 1975 -
                          Keesler Air Force Base Medical Center    June 1976
                          Biloxi, Mississippi

| | |
|---|---|
| Residency<br>Obstetrics and Gynecology<br>Keesler Air Force Base Medical Center<br>Biloxi, Mississippi | July 1976 -<br>June 1979 |
| Chief, Obstetrical Service<br>David Grant Medical Center<br>Travis Air Force Base, California | August 1979 -<br>June 1982 |
| Fellowship<br>Maternal-Fetal Medicine<br>Department of Obstetrics and Gynecology<br>University of Mississippi Medical Center<br>Jackson, Mississippi | July 1982 -<br>June 1984 |
| Chief, Obstetrical Service<br>Keesler USAF Medical Center<br>Keesler Air Force Base<br>Biloxi, Mississippi | July 1984 -<br>May 1986 |
| Chairman, Department of<br>Obstetrics and Gynecology<br>Keesler USAF Medical Center<br>Keesler Air Force Base<br>Biloxi, Mississippi | June 1986 -<br>August 1990 |
| Assistant Professor<br>Department of Obstetrics and Gynecology<br>University of Mississippi Medical Center<br>Jackson, Mississippi | September 1990-<br>June 1994 |
| Associate Professor<br>Department of Obstetrics and Gynecology<br>University of Mississippi Medical Center<br>Jackson, Mississippi | July 1994 -<br>July 1998 |
| Professor<br>Department of Obstetrics and Gynecology<br>University of Mississippi Medical Center<br>Jackson, Mississippi | July 1998 -<br>April 2003 |
| Professor<br>Penn State School of Medicine<br>Hershey, Pennsylvania | May 2003-<br>July 2007 |

|  |  |
|---|---|
| Vice Chairman<br>Department of Obstetrics and Gynecology<br>Lehigh Valley Medical Center<br>Allentown, Pennsylvania | July 2004-<br>May 2006 |
| Director, Maternal Fetal Medicine<br>Lehigh Valley Medical Center<br>Allentown, Pennsylvania | May 2003-<br>July 2007 |
| Member, Division of Maternal Fetal<br>Medicine<br>Erlanger Health System<br>Chattanooga, Tennessee | August 2007-<br>Present |
| Professor<br>University of Tennessee School of<br>Medicine<br>Chattanooga, Tennessee | April 2008 -<br>Present |

**MILITARY:**         Retired Colonel
                United States Air Force

**HONORS AND**        Alpha Omega Alpha Honor
**AWARDS:**           Medical Society

                Merck Medical Scholastic Award

                Winner - Pathology Quiz - AF-ACOG        1978

                Top Poster Award        1996
                CREOG and APGO Annual Meeting
                Albuquerque, New Mexico
                Roberts WE, Morrison JC,
                Morton HH, Perry KG Jr.
                "Does the Electronic Residency
                Application Services (ERAS) Affect
                Prospective Resident Demographics?"

                Mississippi State Department of Health
                Birth Defect Registry
                Vice President        June 1, 1999

                *Best Doctors*        2001-2002

| | | |
|---|---|---|
| CREOG *Teacher of the Year* Department of Obstetrics and Gynecology | | 2003-2004 |
| *Best Doctors* | | 2005-2006 |
| America's Top Obstetricians and Gynecologists | | 2006-2007 |
| America's Top Obstetricians and Gynecologists | | 2007-2008 |
| America's Top Obstetricians and Gynecologists | | 2008-2009 |
| Outstanding Teaching Award Erlanger Heath System | | 2009 |
| America's Top Obstetricians and Gynecologists | | 2009-2010 |
| *Best Doctors* | | 2009-2010 |

| | | |
|---|---|---|
| **CERTIFICATION:** | American Board of Obstetrics and Gynecology | 1981 |
| | Recertification | 2008 |
| | American Board of Obstetrics and Gynecology: Maternal-Fetal Medicine | 1987 |
| | Maternal-Fetal Medicine Recertification | 2008 |

| | | |
|---|---|---|
| **LICENSURE:** | Alabama | 1975 |
| | Mississippi | 1978 |
| | Pennsylvania | 2003 |
| | Georgia | 2007 |
| | Tennessee | 2007 |
| | North Carolina | 2009 |

- 4 -

3. Janice M. Lage, M.D.
   Department of Pathology
   University of Mississippi Medical Center
   2500 North State Street
   Jackson, MS 39216

Dr. Lage is a board certified Pathologist who is a Professor and Chair of the Pathology Department at the University of Mississippi Medical Center. Her Curriculum Vitae is attached hereto and marked as Exhibit E. Dr. Lage charges $600.00 per hour for case/pathology slide review, $2,500.00 per half day for Deposition Testimony and $600.00 per hour plus expenses for trial testimony. Dr. Lage is expected to testify as to causation in this case, based upon her education, training, experience and a review of the pathology slides in this case. Dr. Lage's opinions are more fully set out in her opinion letter, attached hereto as Exhibit F. Dr. Lage is a shared expert with co-defendants.

4. David C. Jude, M.D.
   1600 Medical Center Drive
   Huntington, WV 25701

Dr. Jude is a board certified Obstetrics and Gynecology physician. He is expected to testify in keeping with his deposition taken in this matter, including, but not limited to his testimony, that he met the standard of care in his treatment of Shahnaz Rumman.

5. The defendants reserve the right to present expert testimony offered by any expert witness identified by the plaintiff, whether that expert is actually called to trial as a witness for the plaintiff or not.

PLAINTIFF'S
EXHIBIT
12
tabbies

Angela T. Bianco, M.D., FACOG
42 Knoll Road
Tenafly, NJ 07670

October 29, 2014

Anne O'Hare, Esquire
Offutt Nord Burchett PLLC
949 Third Avenue, Suite 300
Huntington, WV 25728

Re: Estate of Shahnaz Rumman v. Cabell Hunting Hospital, Inc., et al.

Dear Ms. O'Hare:

I have reviewed the above-captioned case and offer the following:

By way of background, I am a board certified Obstetrics and Gynecology Physician with a specialty in Maternal Fetal Medicine. I have been practicing for approximately 15 years, after completing my fellowship at Mount Sinai Medical Center in Maternal Fetal Medicine.

I reviewed the following materials in preparation for this report:

1. Cabell Huntington Hospital Medical Records Pertaining to Shahnaz Rumman
2. Medical Records from Dr. Sarah Price Pertaining to Shahnaz Rumman
3. Notice of Claim
4. Screening Certificate of Merit
5. Complaint
6. Deposition Transcripts for Drs. Kinnard, Jude, Gutierrez and Granger
7. Plaintiff's Expert Witness Disclosures

Brief Medical Summary

Dr. Rumman was a 37 year old patient at 17 3/7 weeks gestation with a history of hypothyroidism and pre-gestational diabetes when she presented to the Cabell Huntington OB Triage on September 28, 2011. She complained of nausea, vomiting and chills since 1500 that day.

Her obstetrical history was remarkable for a term delivery via caesarian section in 2004, complicated by postoperative endometritis, as well as two spontaneous first trimester abortions.

PLAINTIFF'S EXHIBIT
13
tabbies

Her gynecologic history was remarkable for infertility, as well as two ectopic pregnancies.

Her surgical history included a prior D&C as well as salpingectomy in 2007.

She was triaged in OB Triage at 1849.

Her vital signs on presentation were as follows:
- Temperature: 102.8
- Pulse: 120
- Respirations: 16
- Blood Pressure: 91/67
- Body Mass Index: 27

Dr. Granger is the first physician (2nd year resident) to evaluate Dr. Rumman. She ordered Tylenol, Zofran, IV Fluids, CBC, urinalysis, glucose level, and fetal heart rate assessment. Nurse Pinkerton, at 1953, was unable to auscultate a fetal heart tone. Therefore, Dr. Gutierrez, the senior resident, was notified.

Dr. Gutierrez (third year resident) evaluated Dr. Rumman at 1953, confirming that no fetal heartbeat was auscultated or visualized. An "official" ultrasound was ordered to confirm fetal death.

Dr. Gutierrez also ordered a second CBC, Comprehensive Metabolic Panel, blood cultures, and coagulation studies. Dr. Gutierrez at that time documented that Dr. Rumman had a nontender abdomen.

At 2040, Dr. Rumman was taken to Radiology for an "official" ultrasound.

At 2101, fetal death was confirmed by ultrasound.

At 2218, a physical exam was performed including a Sterile Speculum Exam which revealed a dilated cervix with bulging membranes, and malodorus/purulent fluid in the vagina.

At 2220, Dr. Jude wrote a note as follows: Pelvic-uterus nontender, malodorous fluid, Imp/Rec-Choriamnionitis/Sepsis/IUFD, plan IV antibiotics and cytotec.

At 2226, gentamicin/clindamycin ordered by Dr. Gutierrez.

At 2330, Dr. Gutierrez wrote a note denoting lab results: the White Blood Count was 1.4, Hematocrit 29.6, Platelet Count 158, HCO3 16.5, lactate 4. Her impression was sepsis, with plan for misoprostol, IV gentamicin/clindamycin, IVF boluses and cultures

Clindamycin was given at 2330.

Gentamycin was ordered at 22:46 but the MAR does not reflect administration until 0617 on 9/29/2011

At 2340, Dr. Rumman was transferred to the ICU due to hypotension. Upon arrival she was evaluated by Dr. Kinnard, who added ampicillin to the regimen. This was ordered at 0115 on September 29, 2011 and given at 0246.

At 0305 on September 29, 2011, Spontaneous Vaginal Delivery of nonviable fetus and placenta occurs. The note states IVF/antibiotics per ICU team.

Cultures return with gram negative bacillus at 0700

At 0725 the patient's abdomen is distended.

At 0841, she was intubated.

At 1025, it was noted that the patient was oliguric on pressors.

At 1100, the Infectious Disease Physician changed antibiotics to Zosyn and single dose gentamycin, and the clindamycin and ampicillin were discontinued.

At 2111, Primaxin was ordered.

On September 30, 2011, she was diagnosed with ARDS and renal failure.

On October 1, 2011, she experienced ventricular tachycardia.

On October 2, 2011, Dr. Rumman was in refractory septic shock, experienced disseminated intravascular coagulation, renal failure and her pupils were noted to be fixed/dilated.

Dr. Rumman expired on October 2, 2011 due to multisystem organ failure.

Final cultures showed E coli, sensitive to gentamycin.

My comments regarding the opinions expressed by the Plaintiff's experts are as follows:

### Dr. Kenneth Larsen

Dr. Larsen's statement that Dr. Gutierrez did not meet the standard of care due to a lack of sepsis recognition, is not valid given the WBC of 1.4 had not returned, and the observed blood pressure on presentation is common in the second trimester of pregnancy. Furthermore, the patient's self-reported primary complaint was nausea and vomiting, and being a healthcare provider, the possibility of a viral illness was high due to her potential exposure to sick contacts. She did not admit to vaginal loss of fluid until an SSE was performed (which in interrogatories Dr. Gutierrez states that Dr. Rumman initially declined and wanted her nausea and vomiting treated first). Her tachycardia was initially attributed to a fever and it is important to note that the average pulse in pregnancy is 10/15 beats per minute higher than in the nonpregnant state.

Dr. Larsen's statement regarding severe sepsis based on lab work is incorrect. At the time the lactate resulted, broad spectrum antibiotics and IV fluids were already ordered.

Dr. Larsen's statement that Dr. Rumman presented with sepsis and fetal demise, and not a life threatening condition, is erroneous as sepsis is a life threatening condition.

Dr. Larsen further states that Dr. Jude did not meet the standard of care by recognizing and treating sepsis accordingly. However, Dr. Jude did order IV fluids as well as antibiotics within the recommended time period according to the 2008 Stop Sepsis Campaign guidelines that were in place at that time.

### Dr. William Roberts

Dr. William Roberts states sepsis in pregnancy may be insidious and patients do not present critically ill, and that death occurs in over 25% of cases (he cites Clinics NA 2007 (34) 459), which contradicts Dr. Larsen's opinion that Dr. Rumman's condition was not life threatening.

Dr. Roberts faults nurse Brenda Brown for failing to recognize that gentamycin was ordered but had not been administered, when during interrogatories nurse Brown recalls that she did in fact administer the gentamycin but neglected to scan it into the MAR system during the transition of care from the labor floor to the ICU.

Dr. Roberts states that the E-coli organism that was identified was resistant to clindamycin and that the only antibiotic that the E-coli strain that grew was sensitive to was gentamycin. Dr. Roberts is incorrect as the very article he references (ObGyn Clin NA 34 (2007) 459-79) clearly states that intra amniotic infections are typically poly microbial, rarely do organisms actually grow in specimen cultures and should always be treated with broad spectrum, not single agent antibiotic therapy. Dr. Roberts states the presence of a fetal death should have led them to a diagnoses of septic abortion. She did not have a septic abortion by definition, she had a severe intra amniotic infection, with likely overwhelming fetal infection, leading to fetal death. The term 'septic abortion' is used when describing infection after an attempted pregnancy termination.

In fact, fetal death is uncommon with intra amniotic infection and the fact that she presented with fetal death suggests she was infected for a significant amount of time prior to presentation.

Dr. Roberts cites Crit Care Med 2006 :34: 1589 that each hour after diagnosis of septic shock is associated with a7% increase in mortality. In all likelihood, Dr. Rumman was probably septic prior to her arrival at Cabell Huntington, based on the fetal death, the rapidity with which an organism was identified and the evidence of overwhelming infection on placental pathology. However, as he cites, sepsis is difficult to diagnose in the obstetric patient as they are typically able to compensate until severe sepsis or septic shock appears.

Dr. Roberts states antibiotics should have been ordered stat, however antibiotics are not typically ordered as a stat medication.

He cites Sibais paper but that clearly states that indicators of poor outcome include prior debilitating states, such as diabetes and thyroid disease, which Dr Rumman had.

### Dr. James Leo

Dr. Leo references a CHH policy regarding the care of obstetrical patients in the ER or on the labor floor depending on gestational age. However the policy stated patients with nonpregnancy related complaints <20wks gestation should be evaluated in the ER. Dr. Rumman in fact was suffering from a pregnancy related condition.

The delay in diagnosing fetal death is irrelevant. The diagnosis of IAI alone, even in the absence of fetal death is reason enough for uterine evacuation. Dr Leo talks about source control being a tenant of treating sepsis, in this case source control involved evacuation of the uterus which was delayed by Dr. Rumman's request to delay initial vaginal exam as well as the delay in initiating misoprostol induction at her request.

He states that even when following the algorithm from the Stop Sepsis campaign the mortality rate is up to 20%.

He states the patient did not receive effective antibiotics for 8.5 hours after the diagnosis of "severe sepsis" could have been made, which is approximately 10pm which is when, in fact, they did make the diagnosis.

### Dr Beigi (obgyn)

Dr. Beigi states that Dr. Rumman had clear evidence of SIRS upon initial presentation. It is again important to note that her leucopenia was not evident until just prior to Dr. Jude's evaluation. Furthermore the definition of SIRS has not been clearly elucidated in the pregnant population. As mentioned previously the BP and pulse requirements may differ in the pregnant population. Standard of care regarding fetal viability is not relevant at 17weeks, nor is it relevant to the management of this case.

The pathology report was c/w overwhelming infection which was obviously present at 250am when the placental delivery occurred and likely reflects that she had refractory sepsis at that time, as well as suggesting that her septic state was likely present prior to her arrival, but confounded by her pregnant state.

He states that Dr. Rumman's statements did not interfere with her outcome; however, I believe they were unintentionally obstructive.

The interrogatories state she refused initial pelvic exam, then refused misoprostol induction, which is the tenant of treatment of sepsis, that being source control.

She initially refused central line placement as well as foley catheter, undermining efforts at IVF resuscitation and hemodynamic status. She also undermined a diagnosis of severe sepsis by refusing ABG analysis.

Mr. Gaston quotes the CHH tip of the week regarding a small window of time to begin treatment for sepsis, however, Dr. Rumman was declining adequate treatment, including thorough initial exam and uterine evacuation.

It is my professional opinion that the treatment Dr. Rumman received while at Cabell Huntington Hospital was within the established standard of care in 2011. My opinions are given within a reasonable degree of medical probability. It is my opinion that Dr. Rumman was infected with a particularly virulent organism(s), her infection was likely severe upon initial presentation but was confounded due to her general good health, age and pregnancy. More than likely, her severe sepsis was refractory to antibiotic therapy and fluid resuscitative efforts, as her infection was overwhelming, as evidenced by clinical exam with the unusual finding of purulent fluid as well as placental pathologic findings.

I hold the foregoing findings and opinions to be true to a reasonable degree of medical probability. I reserve the right to amend these findings as additional information becomes available.

Very truly yours,

Angela T. Bianco, M.D., FACOG

### *James D. Leo, MD, FACP, FCCP*

*Diplomate, Subspecialty Board in Critical Care Medicine*
*Diplomate, American Board of Internal Medicine*
*Diplomate, American Board of Emergency Medicine*
*Fellow, American College of Physicians*
*Fellow, American College of Chest Physicians*

## Robert Flaugher v. Cabell Huntington Hospital, Inc., et al.

### Opinion Letter

September 22, 2014

I am physician licensed to practice medicine in the State of California. After completing my undergraduate degree in Biology at the Massachusetts Institute of Technology in 1977, I attended medical school at the University of California-San Francisco, where I obtained my medical degree in 1981. I completed my internship in Internal Medicine at the Veterans Administration Hospital in Los Angeles, followed by a residency in Emergency Medicine at the University of California Los Angeles Center for Health Sciences. Following that, I completed my residency in Internal Medicine at the Los Angeles County-USC Medical Center.

I have been board certified in Internal Medicine by the American Board of Internal Medicine since 1988. I have also been board certified in the subspecialty of Critical Care Medicine since 1992. I am also board certified in Emergency Medicine and have been so board certified from 1986 to 2006, and from 2009 to present. Each of the foregoing board certifications is current as of the date of this declaration.

I am currently employed in private practice in both Internal Medicine and Critical Care Medicine in Long Beach, California. I am also the Medical Director of Best Practice and Clinical Outcomes for the MemorialCare Health System in Southern California. In that role, I am responsible for the system-wide implementation of evidence-based best practice in our six hospitals with approximately 2300 physicians. I am the system-wide leader of MemorialCare's effort to reduce mortality due to sepsis, and specifically for system-wide implementation of the Surviving Sepsis Campaign guideline. In addition, I have had a leadership role in Critical Care that has included oversight of quality of care by ICU staff, including physicians and nurses, and have participated in the formulation of nursing policy and procedure in the Intensive Care Unit. I am familiar with the standard of care for nurses who treat septic patients such as Dr. Rumman. My full qualifications and education, as well as publications, are set forth in my Curriculum Vitae, attached hereto.

I was retained by the Miller and Zois, L.L.C. law firm to review the care provided to Shahnaz Rumman, M.D. at Cabell Huntington Hospital. My fee for record review is $500/hour, for deposition is $700/hour, and for trial testimony is $7,000 per trial day plus $2,500 per additional half-day of travel.

*6511 E. Pacific Coast Hwy Suite B   Long Beach, CA 90803*
*Phone: (562) 594-4500   Fax: (562) 493-3456   Email: jleomd@alum.mit.edu*
*Mailing Address: 6475 E. Pacific Coast Hwy, #575 Long Beach, CA 90803*



PLAINTIFF'S EXHIBIT
14

I have reviewed the medical records of care provided to decedent Shahnaz Rumman, M.D. from September 28, 2011 to her death on October 2, 2011. I have reviewed the following documents:

1.    Medical Records of Cabell Huntington Hospital
2.    Depositions of:
      a.    Jessica Granger, M.D.
      b.    David Jude, M.D.
      c.    Christine Gutierrez, M.D.
      d.    Fadi Alkhankan, M.D.
      e.    Randy Kinnard, M.D.
      f.    Amanda Elswick, R.N.
      g.    Brenda Brown, R.N.
      h.    Hoyt Burdick, M.D.
      i.    Jennifer Confer, Pharm.D.
      j.    Whitney Pinkerton, R.N.
      k.    Alexis Daugherty, R.N.
      l.    Lisa Midkiff, R. Ph.
3.    Defendants' Answers to Interrogatories
4.    Excerpted Policies and Procedures of Cabell Huntington Hospital

On the basis of that review and for the reasons stated herein, I have reached the following opinions:

1.      At the time she presented to Cabell Huntington Hospital (hereinafter referred to as "CHH"), by the statutory definition of "emergency condition", Dr. Rumman did not present to the labor and delivery unit in an emergency condition. I have had experience treating patients with conditions similar to that of Dr. Rumman, and I am familiar with the standard of care for the management of such patients by emergency department staff, ICU staff, and ICU physicians.

2.      According to the medical records, Dr. Rumman arrived at OB Triage at 1735 hours on 9/28/11, but was not seen by a triage nurse until approximately 1900 hours on 9/28/11. At that time, the temperature was 102.8°F, pulse 120, and blood pressure 91/67. Despite her presentation with fever and tachycardia, no assessment of fetal heart tones was performed until 1953 hours, at which point fetal heart tones were noted to be unobtainable by Dr. Granger. Dr. Gutierrez was summoned to the bedside, and conducted an ultrasound without visualization of heart movement. A formal ultrasound was obtained in radiology at 2101 hours demonstrating no fetal activity, with the findings felt to be suspicious of fetal demise in-utero. Dr. Gutierrez was informed of those results. Dr. Rumman was evaluated by attending obstetrician Dr. Jude at or about 2220 hours. Dr. Jude found the cervix to be dilated to 3 cm, with membranes bulging. He noted the abnormally low white blood cell count at 1.4. His impressions were chorioamnionitis, intrauterine fetal demise, and sepsis. His plan was for intravenous antibiotics, and Cytotec (misoprostol) uterine evacuation.    At 2247 hours, the patient was transferred to the labor and delivery room.

3. On 9/28/11, CHH had in place a policy regarding transporting OB patients to Labor and Delivery which stated,

"Upon arrival assess the patient's complaint. Only patients presenting with complaints related to pregnancy (contractions, vaginal bleeding, abdominal pain, etc) and a confirmed pregnancy 20 and greater week's gestation should be referred to the LDR unit. Other non-pregnancy related complaints (trauma, respiratory, etc) below 20 weeks gestation should be evaluated in the ED with consultation from Obstetrics at the discretion of the ED Physician."
According to CHH's Policy and Procedure, Dr. Rumman, should have been admitted to
    ED, not to Labor and Delivery.

4. According to the the OB Flowsheet, the misoprostol was administered while she was in the Labor and Delivery Unit at 2335 hours.

5. At 0236 hours on 9/29/11, three hours after administration of misoprostol, there was spontaneous vaginal delivery of a stillborn male fetus.

6. On 9/28/11, Dr. Christine Gutierrez' History and Physical report documented a missed abortion, white blood cell count of 1.4 with an absolute neutrophil count of 0.7 (critically low), history of gestational diabetes, with tachycardia present. Blood pressure obtained at that same time was 72/40. Dr. Gutierrez' impression was of a septic abortion, for which her plan was intravenous clindamycin and gentamicin with normal saline fluid boluses and transfer to the intensive care unit. Dr. Gutierrez had, in fact, written orders for those two antibiotics at 2230 hours on 9/28/11, but ordered both of them on a "routine" basis, not stat. The initial dose of clindamycin was administered at 2330 hours on 9/28/11. According to the MAR, the initial dose of gentamicin was not administered until 0617 hours on 9/29/11. Gentamicin was not administered in OB Labor and Delivery. There is no order in the medical record for the administration of gentamicin at 2300 hours on 9/28/11.

7. , Subsequent to her transfer to the ICU at 0015 hours on 9/29/11, Dr. Rumman was seen and evaluated by internal medicine resident Dr. R. Kinnard, who issued a consultation note at 0212 hours on 9/29/11. Dr. Kinnard acknowledged that the patient was transferred to the ICU due to hypotension. His assessment was "sepsis likely secondary to septic abortion." He stated that the "Patient on gent and clinda will add ampicillin." He further indicated his plan to obtain infectious disease consultation in the morning. He stated that lactic acid was likely elevated "due to abortion." With respect to hypotension, his impression was that this was secondary to sepsis, and stated that the patient was receiving her second fluid bolus. Her initial fluid bolus consisting of one liter of Lactated Ringers solution was started in the OB triage area at 1943 hours on 9/28/11. The second liter of Lactated Ringers was started at 0159 hours on 9/29/11. Dr. Kinnard noted that his attending physician, Dr. Zaman, requested central line placement, but that the patient had refused such. His plan was to continue aggressive fluid administration.

8. Pursuant to an order by Dr. Kinnard for ampicillin, 2 g of ampicillin was administered at 0246 hours on 9/29/11. Additional intravenous fluid was administered

during the early morning hours, consisting of one liter of normal saline starting at 0246 hours, followed by one liter of Lactated Ringers starting at 0259 hours, another liter of normal saline starting 0359 hours, another liter of normal saline at 0459 hours, and one more liter of Lactated Ringers at 0559 hours.

9.     Blood cultures drawn on 9/28/11 at 2141 hours grew E. coli resistant to ampicillin but sensitive to gentamicin. Clindamycin has no effect on E. coli. Because the E. coli in this case was resistant to Ampicillin, the ampicillin had no effect upon the infection. Therefore, of the three antibiotics ordered, only gentamicin would have any impact on the E. coli infection.

10.     Transfer of Dr. Rumman to the OB-Labor and Delivery Unit was in direct violation of the CHH's own written policy, and was a violation of the standard of care. Had the patient been admitted to the ED and had the standard of care for the assessment and management of patients presenting with severe sepsis been followed, the patient would, to a reasonable degree of medical probability, have timely received all appropriate antibiotics and would have been diagnosed with intrauterine fetal demise hours earlier than actually occurred, with resultant evacuation of the uterus occurring not later than approximately 2250 hours on 9/28/11. Specifically, had the standard of care been followed, and assuming a presentation time in the emergency department of 1735 hours on 9/28/11, vital signs would have been obtained within minutes. The absence of fetal heart tones, recognition of septic missed abortion, and initiation of obstetrical consultation would have occurred within an hour of arrival. Assuming the same time delay in administration of misoprostol as occurred subsequent to Dr. Jude's request for that medication that occurred at about 2220 hours, Dr. Rumman would have received her misoprostol by 1950 hours, and would have delivered by 2250 hours - nearly 4 hours earlier than actually occurred. Again, had the standard of care been followed if the patient had been kept in the emergency department, clindamycin and gentamicin would have been administered no later than 1935 hours (2 hours after presentation to CHH).

11.     When Dr. Rumman presented at 1735 hours on 9/28/11, she fulfilled criteria for SIRS (Systemic Inflammatory Response Syndrome). With the presence of intrauterine fetal demise and a fever of 102.8°, a potential diagnosis of septic abortion/chorioamnionitis was present. Therefore, Dr. Rumman met the diagnostic criteria for sepsis. The elevated lactic acid level of 4.23 drawn at 2141 hours on 9/28/11 constituted evidence of end-organ hypoperfusion, which in the presence of sepsis equates to "severe sepsis." Dr. Rumman developed hypotension (defined as a systolic blood pressure less than 90 or a mean arterial pressure ["MAP"] less than 70 mmHg), which persisted despite volume resuscitation with greater than 2 liters (30 mL/kg) of IV fluid. She therefore also met diagnostic criteria for septic shock.

12. When Dr. Kinnard performed his initial evaluation of Dr. Rumman at 0212 hours on 9/29/11, he had sufficient information to make a diagnosis of severe sepsis. The standard of care for the management of severe sepsis has been well-established for many years, long preceding 2011, and has three essential pillars: vigorous goal-directed volume resuscitation; administration of broad-spectrum antibiotics reasonably calculated to

provide coverage for the typical bacteria causative of the suspected infection, and to be administered as rapidly as possible; and "source control", which refers to the physical removal when possible of the source of infection (e.g., draining an abscess, removing an infected central venous catheter, or, as in the case of a septic missed abortion, evacuating the uterus) (Dellinger RP et al., "Surviving Sepsis Campaign: International guidelines for management of severe sepsis and septic shock: 2008"; Crit Care Med 2008 Vol. 36, No. 1 p. 296-327)..

13.     When Dr. Kinnard assumed the care of this patient in the ICU, he chose not to obtain expert consultation with an infectious disease specialist or a pulmonary critical care specialist at that point in time. Both of those specialties have expertise in the management of severe sepsis, and it is pulmonary/critical care physicians who are most commonly called upon for initial management. In failing to obtain such consultation, Dr. Kinnard took upon himself the mantle of the standard of care for management of severe sepsis.

14.     While evacuation of the uterus was not within Dr. Kinnard's scope of practice, vigorous fluid resuscitation and early and appropriate antibiotic therapy was. I have no criticism of Dr. Kinnard's fluid resuscitation.

15.     It is my opinion that upon assuming care of this patient in the ICU, Dr. Kinnard had an independent duty to determine which antibiotics had been administered already by consulting the MAR, in order to ensure that this key tenet of severe sepsis management was in fact being appropriately managed. Dr. Kinnard has testified at deposition that he did not consult the MAR, because he "didn't have time." Unfortunately, the order for gentamicin, which had been written as a routine (not stat) order, was not actually implemented until 0617 hours on 9/29/11. Is my opinion that this delay in administration of gentamicin would have been averted had Dr. Kinnard reviewed the MAR upon the patient's admission to the ICU, and upon learning that it had not yet been administered, had ordered its immediate administration. Thus, Dr. Rumman would have received the gentamicin approximately 4 hours earlier than she actually did. It is my opinion that the failure by Dr. Kinnard to identify the delay in administration of gentamicin and to order it on a stat basis at the time he evaluated Dr. Rumman constituted a breach of the standard of care.

16.     Dr. Kinnard's order for ampicillin was carried out timely, at 0246 hrs on 9/29/11. Unfortunately, because the E. coli with which this patient was bacteremic was resistant to ampicillin and sensitive to gentamicin, the patient did not receive effective antibiotics for 12 ½ hours after her presentation to OB triage, and for 8 ½ hours after she met criteria for severe sepsis. This delay constitutes a breach in the standard of care for the management of severe sepsis. Furthermore, it is well-established in the medical literature that every hour of delay in appropriate antibiotic administration in severe sepsis with hypotension significantly increases a patient's mortality rate. A study has shown that with such delays, mortality increases by over 7% per hour (Kumar A et al: "Duration of hypotension before initiation of effective antimicrobial therapy is the critical determinant of survival in human septic shock"; Crit Care Med 2006 Jun;34(6):1589-96.

17.     To a reasonable degree of medical probability, timely administration of gentamicin combined with evacuation of the uterus would have resulted in this patient's survival.

18.     The standard of nursing care for this patient included the obligation to administer gentamicin timely. The failure to do so constituted a breach in the standard of care. As a result of this failure, Dr. Rumman's E. coli sepsis was permitted to progress unchecked until 0617 hours on 9/29/11, which delay to a reasonable degree of medical probability was a proximate cause of her death.

19.     There was a delay of diagnosis of intrauterine fetal demise of at least two hours 18 minutes due to the failure to assess for fetal heart tones upon arrival in OB triage. Once Dr. Jude saw this patient at 2220 hours, he immediately identified the presence of chorioamnionitis and sepsis, and instituted misoprostol for uterine evacuation, resulting in spontaneous delivery approximately 3 hours later. Had the intrauterine fetal demise been identified upon triage, and had Dr. Jude evaluate the patient two hours 18 minutes earlier than he did, and assuming that he would have similarly ordered misoprostol at that earlier time, this patient likely would have delivered at least two hours earlier than she did. Thus, evacuation of the septic products of conception combined with timely administration of gentamicin would have afforded this patient a substantially greater chance of survival.

20.     In the management of severe sepsis, timely therapy is of the essence. As noted above, the Surviving Sepsis Campaign has set as the standard of care a goal of adequate volume resuscitation within six hours, administration of broad-spectrum antibiotic therapy within one hour of presentation with severe sepsis or septic shock, and source control as soon as it is feasible to accomplish this (Dellinger RP et al., "Surviving Sepsis Campaign: International guidelines for management of severe sepsis and septic shock: 2008"; Crit Care Med 2008 Vol. 36, No. 1 p. 296-327). The implementation of the management algorithm in the Surviving Sepsis Campaign has resulted in marked reductions in sepsis mortality across the United States, with mortality rates dropping from the 40-45% range to less than 20% in many centers. It is very clear that the use of this algorithm results in a major reduction in patient mortality.

21.     But for the breaches in the standard of care outlined above, to a reasonable degree of medical probability, this patient would have had a greater than 26% chance of survival, and more likely than not, the above breaches of the standard of care were a proximate cause of Dr. Rumman's death. This conclusion is based upon my education, training and experience in managing septic patients, the national experience with implementation of the Surviving Sepsis Campaign guidelines, as well as published data cited above on the hourly increase in mortality accompanying delay in appropriate antibiotic therapy, such as was suffered by this patient. The failure of Nurse Brown to administer the first dose of gentamicin until 0617 hours on 9/29/11 was a breach of the standard of care. Had she administered the gentamicin upon admission to the ICU, Dr. Rumman would have had

greater than 26% chance of survival, and to a reasonable degree of medical probability, this breach of the standard of care was a proximate cause of Dr. Rumman's death.

22.     It is also my opinion that Cabell Huntington Hospital breached the standard of care by the actions of its employees in the emergency department who directed Dr. Rumman to go directly to the OB unit, for the reasons discussed above, and by and through the actions of its employee Brenda Brown, RN, for the reasons stated above. But for these breaches of the standard of care by Cabell Huntington Hospital, Dr. Rumman would have had greater than 26% chance of survival, and to a reasonable degree of medical probability this breach of the standard of care was a proximate cause of Dr. Rumman's death.

23.     It is my opinion within a reasonable degree of medical probability that nothing that Dr. Rumman did or did not do, once she arrived at the hospital, caused or contributed to her death.

Sincerely yours,

James D. Leo, MD

James D. Leo, M.D., FACP, FCCP

# CURRICULUM VITAE

**NAME:**  **DEBRA SPICEHANDLER M.D.**

**ADDRESS:**  16 Bessel Lane
Chappaqua, New York 10514

**HOME TELEPHONE:**  (914) 238-8918

**OFFICE TELEPHONE:**  (914) 238-6330

**DATE OF BIRTH:**  January 11,1955

**PLACE OF BIRTH:**  Oceanside, New York

**SOCIAL SECURITY#**  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

**EDUCATION:**  Lawrence High School-1972
Brown University :BA- 1976
University of Cincinnati College of Medicine
M.D.-1980

**TRAINING:**  Intern(Medicine)1980-81
Resident I and II(Medicine) 1981-83
Fellowship in Infectious Diseases-1983-85
Manhattan VA Medical Center and New York
University

**LICENSE&CERTIFICATION:**  License:New York State-1981(#146496)
Certificate:American Board of Internal
Medicine-1983
Certificate:Subspecialty Board of Infectious
Diseases-1997
Recertified 2007

**FACULTY APPOINTMENT:**

Teaching Assistant in Medicine, New York University-1983-85
Clinical Instructor-New York University Medical Center-1985-86
Attending Staff in Medicine-Manhattan VA Medical Center-1985-86
Assistant Professor in Medicine, New York Medical College-January 1986-
Teaching Attending in Medicine-Mount Vernon Hospital January-1995-
Associate Director of Internal Medicine Residency Program 2010-



PLAINTIFF'S
EXHIBIT
15

tabbies

## CURRICULUM VITAE

### David M. Parenti, M.D.

**ADDRESS:** Division of Infectious Disease
Medical Faculty Associates
George Washington University Medical Center
2150 Pennsylvania Avenue NW
Washington, DC 20037
(202) 741-2234/FAX (202) 741-2241
dparenti@mfa.gwu.edu

**EDUCATION:**

**Undergraduate**

| | | |
|---|---|---|
| 9/68-6/72 | University of California Davis | B.S., Biological Sciences |

**Graduate**

| | | |
|---|---|---|
| 9/72-6/74 | University of California Davis | M.A., Zoology |
| 9/73-6/77 | Georgetown University School of Medicine Washington, DC | M.D., cum laude |
| 10/79-10/80 | London School of Hygiene and Tropical Medicine London, England | M.Sc., Clinical Tropical Medicine |

### POSTGRADUATE TRAINING:

| | |
|---|---|
| 7/77-6/78 | Northwestern Memorial Hospital Intern, Internal Medicine Chicago, Illinois |
| 7/78-9/79 10/80-6/81 | Northwestern Memorial Hospital Resident, Internal Medicine Chicago, Illinois |
| 7/81-6/82 | Tufts-New England Medical Center Clinical Fellow, Infectious Diseases Boston, Massachusetts |
| 7/82-6/84 | Tufts-New England Medical Center Research Fellow, Infectious Diseases Boston, Massachusetts |



PLAINTIFF'S EXHIBIT
tabbies
16