IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT
HUNTINGTON, WEST VIRGINIA


ROBERT A. FLAUGHER, as Administrator of the
Estate of Shahnaz Rumman,

        Plaintiff,

vs.                                  **CASE NUMBER: 3:13-cv-28460**


CABELL HUNTINGTON HOSPITAL, INC.;
UNIVERSITY PHYSICIANS & SURGEONS, INC.;
MARSHALL UNIVERSITY BOARD OF GOVERNORS;
JESSICA K. GRANGER; CHRISTINE V. GUITEREZ;
DAVID C. JUDE; RANDY S. KINNARD;
BRENDA BROWN; and Y ALEXIS DAUGHERTY,

        Defendants.

### DISCLOSURE OF EXPERT WITNESSES BY DEFENDANTS, CABELL HUNTINGTON HOSPITAL, INC.; BRENDA BROWN, AND Y ALEXIS DAUGHERTY

    Comes now Defendants, Cabell Huntington Hospital, Inc., a West Virginia corporation, Brenda Brown, and Y Alexis Daugherty, by and through counsel, Thomas L. Craig, Rebecca C. Brown, and the law firm of Bailes, Craig & Yon, PLLC, and in accordance with the Court's scheduling order discloses the following expert witnesses who may be called to testify at the trial of this matter. This expert disclosure is preliminary and subject to further supplementation through the course of discovery:

1.    R. Phillip Dellinger, M.D.
        One Cooper Plaza
        383 Dorrance
        Camden, New Jersey 08103

BAILES, CRAIG & YON, PLLC
ATTORNEYS at LAW
401 10TH ST., SUITE 500
HUNTINGTON, WV



PLAINTIFF'S
EXHIBIT
9

A.    **Summary of anticipated testimony.**

*See*, Exhibit 1.

B.    **Bases of opinions.**

Dr. Dellinger bases his opinions on his education, training and experience, as well as his review of the medical records, x-rays and the depositions in this case.

Dr. Dellinger has received the following documents for review:

1.    A CD of all medical records in this case;

2.    The admission sheet dated 9/28/11 and indicating an admission of 18:25;

3.    A copy of the Amended Complaint;

4.    Notice of Claim and Certificate of Merit;

5.    Pharmacy records;

6.    The deposition transcript of Kazi Hossain;

7.    The deposition transcript of Rubina Ahmed;

8.    The deposition transcript of Dr. Jude;

9.    The deposition transcript of Dr. Kinnard;

10.   The deposition transcript of Dr. Granger;

11.   The deposition transcript of Lisa Midkiff;

12.   The deposition transcript of Jennifer Confer;

13.   The deposition transcript of Whitney Pinkerton;

14.   The deposition transcript of Amanda Elswick;

15.   The deposition transcript of Brenda Brown;

2

16.     The deposition transcript of Y Daugherty;

17.     The deposition transcript of Dr. Burdick;

18.     The deposition transcript of Dr. Gutierrez;

19.     The medical records of William Burns, M.D.;

20.     The medical records from Marshall University School of Medicine;

21.     The medical records of Dr. Sarah Price; and

Dr. Dellinger will review other materials as they are made available in the course of the development of this case.  He may also rely upon other materials, including but not limited to, textbooks and publications depending on the matters presented as this case develops.

**C.     Exhibits used to summarize and support his opinion.**

None.

**D.     Curriculum Vitae**

A copy of his Curriculum Vitae is attached hereto as Exhibit 1A.

**E.     List of Cases.**

1.     *Spiller v. CHCA*;

2.     *Jain v. Summerlin Hosp.*;

3.     *Chuang v. Suburban Hospital*;

4.     *Linda Kopishke on behalf of Estate of Fay Fidance v. Hooman Noorchashm, MD*;

5.     *Cammie Burney v. Lydia Nightingale, MD v. HCA Health Services of Oklahoma*;

3

BAILES, CRAIG & YON, PLLC
ATTORNEYS at LAW
401 10TH ST., SUITE 500
HUNTINGTON, WV

6.    *Gwendolyn Fontenot v. Touro Infirmary*;

7.    *Pamela Wyatt for Estate of Chaz Kortz v. Magdy A. Kaldas, ME, et*

*al.*;

8.    *Joseph Miller v. Northeastern Vermont Reg.*;

9.    *Rellihan v. Bon Secours*;

10.    *Vanessa White v. Alan Schuricht*; and

11.    *Hensley v. Fultz.*

**E.**    **Fee Schedule**

*See*, Exhibit 1B

2.    Janice M. Lage, M.D.
501 Chuck Wagon Drive
Brandon, MS 39042

**A.**    **Summary of anticipated testimony:**

*See*, Exhibit 2.

**B.**    **Bases of opinions.**

Dr. Lage bases her opinions on her education, training and experience, as well as her basic review of the medical records, and review of placental slides.

Dr. Lage received the following documents for review:

1.    A CD of all medical records in this case;

2.    The admission sheet dated 9/28/11 and indicating an admission of 18:25;

3.    A copy of the Amended Complaint;

4.    Notice of Claim and Certificate of Merit;

4

Bailes, Craig & Yon, PLLC
ATTORNEYS at LAW
401 10th St., Suite 500
Huntington, WV

5.       Pharmacy records;

6.       The deposition transcript of Kazi Hossain;

7.       The deposition transcript of Rubina Ahmed;

8.       The deposition transcript of Dr. Jude;

9.       The deposition transcript of Dr. Kinnard;

10.     The deposition transcript of Dr. Granger;

11.     The deposition transcript of Lisa Midkiff;

12.     The deposition transcript of Jennifer Confer;

13.     The deposition transcript of Whitney Pinkerton;

14.     The deposition transcript of Amanda Elswick;

15.     The deposition transcript of Brenda Brown;

16.     The deposition transcript of Y Daugherty;

17.     The deposition transcript of Dr. Burdick;

18.     The deposition transcript of Dr. Gutierrez;

19.     The medical records of William Burns, M.D.;

20.     The medical records from Marshall University School of Medicine;

21.     The medical records of Dr. Sarah Price; and

22.     Placental slides.

Dr. Lage will review other materials as they are made available in the course of the development of this case. She may also rely upon other materials, including but not limited to, textbooks and publications depending upon the matters presented as this case develops.

**C.**     **Exhibits used to summarize and support opinion.**

5

BAILES, CRAIG & YON, PLLC
ATTORNEYS at LAW
401 10TH ST., SUITE 500
HUNTINGTON, WV

None.

**D.     Curriculum Vitae**

A copy of her Curriculum Vitae is attached hereto as Exhibit 2A.

**E.     List of Cases.**

Dr. Lage cannot retrieve this information.  She does not keep a list of cases in which she participated.

**F.     Fee Schedule**

*See*, Exhibit 2B

3.     David Feola, Ph.D.
       University of Kentucky College of Pharmacy
       789 South Limestone Street
       Lexington, KY 40536

**A.     Summary of anticipated testimony:**

*See*, Exhibit 3.

**B.     Bases of opinions.**

Dr. Feola bases his opinions on his education, training and experience, as well as his review of the medical and pharmacy records in this case.

Dr. Feola has received the following documents for review:

1.     A CD of all medical records in this case;

2.     The admission sheet dated 9/28/11 and indicating an admission of 18:25;

3.     A copy of the Amended Complaint;

4.     Notice of Claim and Certificate of Merit;

5.     Pharmacy records;

6

Bailes, Craig & Yon, PLLC
ATTORNEYS at LAW
401 10th St., Suite 500
Huntington, WV

6.     The deposition transcript of Kazi Hossain;

7.     The deposition transcript of Rubina Ahmed;

8.     The deposition transcript of Dr. Jude;

9.     The deposition transcript of Dr. Kinnard;

10.     The deposition transcript of Dr. Granger;

11.     The deposition transcript of Lisa Midkiff;

12.     The deposition transcript of Jennifer Confer;

13.     The deposition transcript of Whitney Pinkerton;

14.     The deposition transcript of Amanda Elswick;

15.     The deposition transcript of Brenda Brown;

16.     The deposition transcript of Y Daugherty;

17.     The deposition transcript of Dr. Burdick;

18.     The deposition transcript of Dr. Gutierrez;

19.     The medical records of William Burns, M.D.;

20.     The medical records from Marshall University School of Medicine;

21.     The medical records of Dr. Sarah Price; and

Dr. Feola will review other materials as they are made available in the course of the development of this case. He may also rely upon other materials, including but not limited to, textbooks and publications depending on the matters presented as this case develops.

**C.     Exhibits used to summarize and support his opinion.**

Dr. Feola's exhibits are attached hereto as Exhibit 3A.

**D.     Curriculum Vitae**

7

A copy of Dr. Feola's Curriculum Vitae is attached hereto as Exhibit 3B.

**E.      List of Cases.**

Dr. Feola has not testified at deposition or at trial in the last four years.

**F.      Fee Schedule**

Dr. Feola's fee schedule is attached hereto as Exhibit 3C.

4.      Richard Brandon Frady, MSN, RN, ACNP-BC, CMC
2201 Fellowship Court
Tucker, GA 30084

**A.      Summary of anticipated testimony:**

*See,* Exhibit 4.

**B.      Bases of opinion.**

Mr. Frady bases his opinions on his education, training and experience,

as well as his review of the medical records in this case.

Mr. Frady has received the following documents for review:

1.      A CD of all medical records in this case;

2.      The admission sheet dated 9/28/11 and indicating an admission of

18:25;

3.      A copy of the Amended Complaint;

4.      Notice of Claim and Certificate of Merit;

5.      Pharmacy records;

6.      The deposition transcript of Kazi Hossain;

7.      The deposition transcript of Rubina Ahmed;

8.      The deposition transcript of Dr. Jude;

8

9. The deposition transcript of Dr. Kinnard;

10. The deposition transcript of Dr. Granger;

11. The deposition transcript of Lisa Midkiff;

12. The deposition transcript of Jennifer Confer;

13. The deposition transcript of Whitney Pinkerton;

14. The deposition transcript of Amanda Elswick;

15. The deposition transcript of Brenda Brown;

16. The deposition transcript of Y Daugherty;

17. The deposition transcript of Dr. Burdick;

18. The deposition transcript of Dr. Gutierrez;

19. The medical records of William Burns, M.D.;

20. The medical records from Marshall University School of Medicine;

21. The medical records of Dr. Sarah Price; and

Mr. Frady will review other materials as they are made available in the course of the development of this case. He may also rely upon other materials, including but not limited to, textbooks and publications depending on the matters presented as this case develops.

**C.    Exhibits used to summarize and support his opinion.**

None.

**D.    Curriculum Vitae**

A copy of Mr. Frady's Curriculum Vitae is attached hereto as Exhibit 4A.

**E.    List of Cases.**

Mr. Frady has not testified at deposition or at trial in the last four years.

9

BAILES, CRAIG & YON, PLLC
ATTORNEYS at LAW
401 10TH ST., SUITE 500
HUNTINGTON, WV

**F.**     **Fee Schedule**

Mr. Frady's fee schedule is attached here to as Exhibit 4B.

5.          David Parenti, M.D.
            Division of Infectious Disease
            Medical Faculty Associates
            George Washington University Medical Center
            2150 Pennsylvania Avenue NW
            Washington, DC 20037

**A.**     **Summary of anticipated testimony:**

*See*, Exhibit 5.

**B.**     **Bases of opinions.**

Dr. Parenti bases his opinions on his education, training and experience,

as well as his review of the medical and pharmacy records in this case.

Dr. Parenti has received the following documents for review:

1.     A CD of all medical records in this case;

2.     The admission sheet dated 9/28/11 and indicating an admission of

18:25;

3.     A copy of the Amended Complaint;

4.     Notice of Claim and Certificate of Merit;

5.     Pharmacy records;

6.     The deposition transcript of Kazi Hossain;

7.     The deposition transcript of Rubina Ahmed;

8.     The deposition transcript of Dr. Jude;

9.     The deposition transcript of Dr. Kinnard;

10.    The deposition transcript of Dr. Granger;

10

BAILES, CRAIG & YON, PLLC
ATTORNEYS at LAW
401 10th St., Suite 500
Huntington, WV

11.     The deposition transcript of Lisa Midkiff;

12.     The deposition transcript of Jennifer Confer;

13.     The deposition transcript of Whitney Pinkerton;

14.     The deposition transcript of Amanda Elswick;

15.     The deposition transcript of Brenda Brown;

16.     The deposition transcript of Y Daugherty;

17.     The deposition transcript of Dr. Burdick;

18.     The deposition transcript of Dr. Gutierrez;

19.     The medical records of William Burns, M.D.;

20.     The medical records from Marshall University School of Medicine;

21.     The medical records of Dr. Sarah Price; and

Dr. Parenti will review other materials as they are made available in the course of the development of this case.  He may also rely upon other materials, including but not limited to, textbooks and publications depending on the matters presented as this case develops.

**C.      Exhibits used to summarize and support his opinion.**

None.

**D.      Curriculum Vitae**

A copy of Dr. Parenti's Curriculum Vitae is attached hereto as Exhibit 5A.

**E.      List of Cases.**

1.      *Schwabe v. Slattery, et al.*;

2.      *Shahid v. Billing, et al.*; and

3.      *Winsett v. Garland, et al.*

11

BAILES, CRAIG & YON, PLLC
ATTORNEYS at LAW
401 10th St., Suite 500
Huntington, WV

F.     **Fee Schedule**

A copy of Dr. Parenti's fee schedule is attached hereto as Exhibit 5B.

6.     Francilla A. Thomas, MSN, RN-OB, C-EFM
       64 Tremont Terrace
       Wanaque, NJ 07465

A.     **Summary of anticipated testimony:**

*See,* Exhibit 6.

B.     **Bases of opinion.**

Ms. Thomas bases her opinions on her education, training and experience,

as well as her review of the medical records in this case.

Ms. Thomas has received the following documents for review:

1.     A CD of all medical records in this case;

2.     The admission sheet dated 9/28/11 and indicating an admission of

18:25;

3.     A copy of the Amended Complaint;

4.     Notice of Claim and Certificate of Merit;

5.     Pharmacy records;

6.     The deposition transcript of Kazi Hossain;

7.     The deposition transcript of Rubina Ahmed;

8.     The deposition transcript of Dr. Jude;

9.     The deposition transcript of Dr. Kinnard;

10.    The deposition transcript of Dr. Granger;

11.    The deposition transcript of Lisa Midkiff;

12

12.     The deposition transcript of Jennifer Confer;

13.     The deposition transcript of Whitney Pinkerton;

14.     The deposition transcript of Amanda Elswick;

15.     The deposition transcript of Brenda Brown;

16.     The deposition transcript of Y Daugherty;

17.     The deposition transcript of Dr. Burdick;

18.     The deposition transcript of Dr. Gutierrez;

19.     The medical records of William Burns, M.D.;

20.     The medical records from Marshall University School of Medicine;

and

21.     The medical records of Dr. Sarah Price.

Ms. Thomas will review other materials as they are made available in the course of the development of this case.  She may also rely upon other materials, including but not limited to, textbooks and publications depending on the matters presented as this case develops.

**C.      Exhibits used to summarize and support her opinion.**

None.

**D.      Curriculum Vitae**

A copy of Ms. Thomas' Curriculum Vitae is attached hereto as Exhibit 6A.

**E.      List of Cases.**

Ms. Thomas has not testified at deposition or at trial in the past four years.

BAILES, CRAIG & YON, PLLC
ATTORNEYS at LAW
401 10TH ST., SUITE 500
HUNTINGTON, WV

F.    **Fee Schedule**.

A copy of Ms. Thomas' fee schedule is attached hereto as Exhibit 6B.

7.    Brian Adkins, M.D.
2216 Shaker Run Road
Lexington, KY 40509

A.    **Summary of anticipated testimony:**

*See,* Exhibit 7.

B.    **Bases of opinion.**

Dr. Adkins bases his opinions on his education, training and experience,

as well as his review of the medical records in this case.

Dr. Adkins has received the following documents for review:

1.    A CD of all medical records in this case;

2.    The admission sheet dated 9/28/11 and indicating an admission of

18:25;

3.    A copy of the Amended Complaint;

4.    Notice of Claim and Certificate of Merit;

5.    Pharmacy records;

6.    The deposition transcript of Kazi Hossain;

7.    The deposition transcript of Rubina Ahmed;

8.    The deposition transcript of Dr. Jude;

9.    The deposition transcript of Dr. Kinnard;

10.   The deposition transcript of Dr. Granger;

11.   The deposition transcript of Lisa Midkiff;

14

12. The deposition transcript of Jennifer Confer;

13. The deposition transcript of Whitney Pinkerton;

14. The deposition transcript of Amanda Elswick;

15. The deposition transcript of Brenda Brown;

16. The deposition transcript of Y Daugherty;

17. The deposition transcript of Dr. Burdick;

18. The deposition transcript of Dr. Gutierrez;

19. The medical records of William Burns, M.D.;

20. The medical records from Marshall University School of Medicine; and

21. The medical records of Dr. Sarah Price.

Dr. Adkins will review other materials as they are made available in the course of the development of this case.  He may also rely upon other materials, including but not limited to, textbooks and publications depending on the matters presented as this case develops.

**C.     Exhibits used to summarize and support his opinion.**

None.

**D.     Curriculum Vitae**

A copy of Dr. Adkins' Curriculum Vitae is attached hereto as Exhibit 7A.

**E.     List of Cases.**

*Blakely v. Chatterly.*

**F.     Fee Schedule.**

Dr. Adkins' fee schedule is attached hereto as Exhibit 7B.

15

8.      Angela T. Bianco, M.D., FACOG
        42 Knoll Road
        Tenafly, NJ 07670

These Defendants incorporate by reference information provided by Offutt, Nord & Burchett regarding this witness as if fully rewritten herein.

9.      Roger Griffith, MBA
        Gray, Griffith & Mays, A.C.
        707 Virginia Street, East, Suite 400
        Charleston, WV 25301

These Defendants incorporate by reference information provided by Offutt, Nord & Burchett regarding this witness as if fully rewritten herein.

10.     These Defendants reserve the right to name additional expert witnesses as discovery progresses, including but not limited to, an expert on medical records technology.

11.     These Defendants reserve the right to call any experts needed to impeach the credibility of Plaintiff's expert witnesses.

12.     These Defendants reserve the right to supplement these opinions following the depositions of Plaintiff's experts.

13.     These Defendants reserve the right to use the testimony of experts named by other parties to this litigation.

14.     These Defendants reserve the right to illicit expert testimony of treaters, if qualified

15.     These Defendants reserve the right to call fact witnesses as experts, if qualified.

16

BAILES, CRAIG & YON, PLLC
ATTORNEYS at LAW
401 10TH ST., SUITE 500
HUNTINGTON, WV

CABELL HUNTINGTON HOSPITAL, INC.;
BRENDA BROWN; AND
Y. ALEXIS DAUGHERTY

By: /s/ ___Rebecca C. Brown_____
          Of Counsel

Thomas L. Craig (WV 859)
Rebecca C. Brown (WV 7321)
BAILES, CRAIG & YON, PLLC
Post Office Box 1926
Huntington, West Virginia  25720-1926
(304) 697-4700 (Phone)
(304) 697-4714 (Fax)
rcb@bcyon.com

17

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT
HUNTINGTON, WEST VIRGINIA

ROBERT A. FLAUGHER, as Administrator of the
Estate of Shahnaz Rumman,

        Plaintiff,

vs.                                 CASE NUMBER: 3:13-cv-28460


CABELL HUNTINGTON HOSPITAL, INC.;
UNIVERSITY PHYSICIANS & SURGEONS, INC.;
MARSHALL UNIVERSITY BOARD OF GOVERNORS;
JESSICA K. GRANGER; CHRISTINE V. GUTIERREZ;
DAVID C. JUDE; RANDY S. KINNARD;
BRENDA BROWN; and Y. ALEXIS DAUGHERTY,

        Defendants.

## CERTIFICATE OF SERVICE

    The undersigned attorney hereby certifies that he/she served the foregoing

DISCLOSURE OF EXPERT WITNESSES BY DEFENDANTS, CABELL HUNTINGTON

HOSPITAL, INC.; BRENDA BROWN, AND Y ALEXIS DAUGHERTY  on counsel

named below via electronic filing and by depositing a true copy thereof in the United States

mail, postage prepaid at Huntington, West Virginia on the _3rd_ day of November, 2014,

addressed as follows:

C. Benjamin Salango, Esquire
Preston & Salango, PLLC
P.O. Box 3084
Charleston, WV 25331
bsalango@wvlawyer.com
*Co-Counsel for Plaintiff*

BAILES, CRAIG & YON, PLLC
ATTORNEYS at LAW
401 10TH ST., SUITE 500
HUNTINGTON, WV

Rodney M. Gaston, Esquire
Miller & Zois, LLC
Empire Towers, Suite 1001
7310 Ritchie Highway
Glen Burnie, MD 21061
*Co-Counsel for Plaintiff*

D. C. Offutt, Esquire
Anne O'Hare, Esquire
Offutt Nord Burchett, PLLC
949 Third Avenue, Suite 300
Huntington, WV 25701
dcoffutt@ofnlaw.com
*Counsel for Defendants*
*Marshall University Board of Governors*

CABELL HUNTINGTON HOSPITAL, INC.;
BRENDA BROWN; AND
Y. ALEXIS DAUGHERTY

By: /s/  Rebecca C. Brown
            Of Counsel

Thomas L. Craig (WV 859)
Rebecca C. Brown (WV 7321)
BAILES, CRAIG & YON, PLLC
Post Office Box 1926
Huntington, West Virginia  25720-1926
(304) 697-4700 (Phone)
(304) 697-4714 (Fax)
rcb@bcyon.com

October 31, 2014


Ms. Rebecca Brown
Bailes, Craig & Yon, PLLC
401 10th Street, Suite 500
P.O. Box 1926
Huntington, WV 25720-1926

Re:  Rumman

Dear Ms. Brown:

At your request I have reviewed the following documents as it relates to the care of Dr. Rumman during her 9/28/11-10/2/11 hospitalization at Cabell Huntington Hospital.  I have confined my review in order to offer opinions as it relates to nursing care and hospital policy to causation.

1. Admission sheet
2. Plaintiff's Expert Witness Disclosure and Supplemental Disclosure
   a. Kenneth Larson, MD
   b. William Roberts, MD
   c. James Leo, MD
   d. Richard Beigi, MD
   e. Richard Lurito
   f. Debra Spicehandler, MD
3. Depositions
   a. Christine Gutierrez, MD
   b. Dr. Hoyt Burdick
   c. Amanda Elswick
   d. Whitney Pinkerton
   e. Jennifer Confer
   f. Alexis Daugherty
   g. Brenda Brown
   h. Rubina Ahmed
   i. Kazzi Hossain
   j. Lisa Midkif
4. Cabell Hospital ED Identification and Care of Sepsis
5. Hard Copy Sepsis Computerized Order Entry Set
6. Tip of the Week—Sepsis Alert for Inpatient Adults
7. "Shock States" Document
8. Defendant David C. Jude, MD's Answers to Plaintiff's interrogatories
9. Responses to Plaintiff's Interrogatories by Defendant Brenda Brown
10. Timeline from Ms. Brown

Dr. Rumman arrived at Cabell Huntington Hospital at 1825 by admission records on September 28, 2011 and was sent to OB Triage where she was seen shortly thereafter by the nurse who took vital signs, rendered an assessment, and notified Dr. Granger.  Vital signs were temp 102.8, heart rate 120, respiratory rate 16 and blood pressure 91/67.  Dr. Granger was on a shift that ended at 1900.  Dr. Granger ordered lab with results at 1917 showing a WBC 2.9.  The nurse could not find fetal heart tones during an


EXHIBIT

Ms. Rebecca Brown
Bailes, Craig & Yon, PLLC
October 31, 2014
Page 2

ultrasound exam at 1953. Dr. Gutierrez was notified and confirmed bedside US findings and sent patient
to Radiology for definitive diagnosis of fetal demise. Dr. Gutierrez ordered additional lab, which was
available at 2141 and revealed WBC 1.4, K+ 2.7, Bicarb 16, Anion gap 16, Albumin 3.4, lactic acid 4.23.
Dr. Jude the attending physician saw Dr. Rumman around 2220 hours where a GYN exam found the
cervix to be dilated 3 cms with membranes bulging. His impressions were chorioamnionitis, intrauterine
fetal demise and sepsis. His plan was intravenous antibiotics and uterine evacuation. The patient was
transferred to Labor and Delivery around 2245. Vital signs at 2331: HR 115, BP 117/51. Clindamycin
was begun shortly before transfer to SICU. Vital signs at midnight were T 99.7, HR 132, BP 72/40.
Patient was transferred to the SICU shortly after midnight. A new IV was placed in the SICU. There is
no chart documentation of Gentamycin being given (it was ordered), but nurse testimony is that the
Gentamycin would have been given shortly after the new IV was placed.

Following misoprostol administration a spontaneous vaginal delivery of a still-born male fetus occurred at
0236 hours. Ampicillin was begun at 0246. Gentamycin was given at 0617. The patient had received
1000 cc of lactated ringers which were ordered by the initial resident contact, Dr. Granger, and another
liter was stated at 0159. Additional fluid was administered during the early morning hours. Blood
cultures drawn late on 9/28/11 grew E. Coli resistant to ampicillin but sensitive to Gentamycin. She had a
progressive downhill course in the ICU with severe sepsis, septic shock and multiple organ failure. She
died on 10/2/2011.

Dr. Rumman met diagnostic criteria for severe sepsis at 2141 with the return of a lactic acid value of 4.23.
She also met criteria for sepsis induced hypotension at midnight.

Numerous plaintiff complaints have been leveled concerning timely assessment and timely treatment as it
relates to nursing responsibilities. I have the following opinions related to these criticisms and also as it
relates to causation.

1. The assessment by the nurse following arrival at the hospital and notification of physician occurred in
   a timely fashion.

2. Much attention has been directed toward an earlier diagnosis and antibiotic treatment of severe sepsis.
   Assuming Gentamycin was given shortly after the second IV was started, antibiotics were delivered
   in a timely fashion following the diagnosis of severe sepsis and met standard of care.

3. Had fetal heart tones been assessed earlier in OB Triage it would not have effected outcome in this
   case.

4. Had the patient been managed in the Emergency Department as opposed to OB Triage and Labor and
   Delivery, outcome would have been no different.

5. In summary no act of commission or omission by the nurses would have altered the outcome in this
   patient (this does assume Gentamycin was given shortly after arrival in the SICU).

Ms. Rebecca Brown
Bailes, Craig & Yon, PLLC
October 31, 2014
Page 3

My opinions to date are to a reasonable degree of medical probability based on materials I have thus far reviewed in this matter and could change with review of additional materials.

Sincerely,

R. Philip Dellinger, MD
Professor and Chair of Medicine
Cooper Medical School of Rowan University
Senior Critical Care Attending
Medical Director, Adult Health Institute
Cooper University Hospital

Janice M. Lage MD
501 Chuck Wagon Dr.
Brandon, MS 39042

September 7, 2014

Rebecca C. Brown
Bailes, Craig & Yon, PLLC
401 10th Street, Suite 500
Huntington, WV 25720-1926

     RE:  Estate of Shahnaz Rumman v. Cabell Huntington Hospital, Inc., et al

Dear Ms. Brown,

     I have reviewed the above-captioned case and my report is as follows.

     By way of background, I am a board-certified anatomic pathologist with subspecialty expertise in obstetric and gynecologic pathology, specifically, perinatal, placental, and neonatal pathology.  I began my academic career at the Brigham and Women's Hospital, Boston, MA, in the Women's Division in 1984. At the Brigham and Women's Hospital, thousands of placentas were examined annually and over 120 perinatal (baby) autopsies were performed each year.  I remained there for approximately 7 years.  Subsequently, in 1991, I went to Georgetown University working as a general surgical pathologist and was the only placenta and perinatal autopsy pathologist.  In 1999, I moved to the Medical University of South Carolina to take the position of Departmental Chairman.  At MUSC, I served as the senior placenta and perinatal pathologist.  In 2013, I moved to serve as Chairman of the Department of Pathology at the University of Mississippi Medical Center, Jackson, MS.  I have given many nationally invited symposia and courses on placenta and perinatal pathology for all of the main pathology societies: United States and Canadian Academy of Pathology, the American Society of Clinical Pathologists, and the College of American Pathologists.  I am a full Professor with Tenure and Chairman of the Department of Pathology at the University of Mississippi Medical Center.  I serve as an expert consultant to practicing pathologists in the areas of obstetric and gynecologic pathology, and, more specifically, placental pathology, having over 25 years' experience in this subject.

I have reviewed the following materials:
1.   Notice of Claim;
2.   Certificate of Merit;
3.   Complaint;
4.   Chain of Custody signature sheet;

EXHIBIT

2

5. Seven glass slides, labeled, 6441-11, sublabeled 1, 2, 3, 4, 5, 5 gram, and gram control;
6. Final Surgical Report from Cabell Huntington Hospital, CS 6441-11, regarding placenta and gross examination only of fetus; and,
7. A CD labeled Rumman, CHH records, 9/28/11 containing medical records of the mother from Cabell Huntington Hospital.

Brief Medical Summary:

The mother, Shahnaz Rumman, was a 37-year-old G5P1031 medical doctor who has a past medical history of previous cesarean section delivery (2004) and right salpingectomy (2007). This pregnancy was assisted by in vitro fertilization. She has a history of gestational diabetes on insulin control and hypothyroidism. She presented on 9/28/2011 at 17 weeks 6 days to her OB when her water broke. She had repeated vomiting since about 1500 that day. She was examined by her OB and an ultrasound was performed. A diagosis of missed abortion was made as there was no fetal heart beat. She was noted to be febrile with a dilated cervix. IV Clindamycin and gentamicin were ordered. She underwent a D&E for septic abortion.

Following the procedure, her BP was getting progressively lower and she was transferred to the ICU on pressors, intubated and sedated. An ID consult was called. Blood cultures (one set out of two sets) were positive for gram negative rods (after 9 hours).

The vaginal culture collected 9/28/2011 at 23:08 showed moderate gram negative bacilli with no neutrophils on gram stain 9/29/2011 at 10:59. Cultures of the maternal surface of the placenta and the fetal (infant) surface of the placenta also showed many gram negative bacilli and only rare neutrophils. These and subsequent culture results are found on pages 349-351 of the medical records.

By 9/29/11, her labs were suggestive of DIC and hypocalcemia. Hematology consult was requested. Renal consult was requested for oliguria and AKI. She had been started on ampicillin, clindamycin and gentamicin. Given the blood culture positivity for gram negative rods, ampicillin and clindamycin were changed to Zosyn on the morning of 9/29/2011.

Hematology consult on 9/29/2011 at 9:10 AM diagnosed DIC post stillbirth with gram negative sepsis. A karyotype of blood showed 46,XX, normal female.

On 10/1/2011 at 07:45, E coli was identified from a maternal blood culture. The vaginal culture and cultures of the maternal and fetal surfaces of the placenta also grew out E. coli.

By 10/1/2001 she developed ventricular tachycardia and was being treated aggressively for acidosis. She had blood oozing from her nose and mouth. The

right pupil was fixed and dilated, the left pupil was fixed at 3 mm. She was unresponsive to pain.

An endocrinology consult on 10/2/2011 for hyperglycemia greater than 500 showed hyperglycemia/gestational diabetes, DIC, sepsis, respiratory failure, and acute renal failure with lactic acidosis due to septic shock.

Dr. Rumman developed pulseless electrical activity and was coded twice on 10/2/2011. There was no resumption of pulse following the second code. She was pronounced on 10/2/2011 at 13:22. Cause of death was: severe septic shock, DIC, E. coli bacteremia, and endometritis.

Placental and fetal pathology gross findings:
        The specimen was received in formalin, measuring 8.6 x 7.5 x 1.4 cm and weighing 70 grams. Possible adherent clot measuring 2.8 x 1.6 x 0.8 cm was present. Tan translucent fetal membranes. There was an unremarkable pink-red fetal surface. Three-vessel umbilical cord was dusky in color, measuring 14.8 cm in length. Maternal surface was tan-grey and intact. Serial sectioning showed pink-tan parenchyma containing an area of possible hemorrhage measuring up to 1.1 cm in greatest dimension.
        The fetus was identified by tags outside the yellow pad and inside with the body. The fetus showed a severe degree of maceration, normal head, fused eyelids. The fetus grossly was an otherwise unremarkable male. CR=14.4 cm, CH= 21 cm, right FL=2.5 (cm), left FL=2.5 cm, HC = 15.2 cm, thoracic circumference 12 cm, abdominal circumference = 11.8 cm. Attached umbilical cord was 11.5 cm, otherwise grossly unremarkable. No internal examination performed.

Microscopic examination of the placental pathology slides:
1. 3 vessel cord. Bacteria in fetal blood. No funisitis. Collections of rod bacteria on cord surface. Membranes: acute necrotizing and suppurative chorioamnionitis; abundant bacteria, rods, in amnion, detached amnion, abundant bacteria, rods, in decidua, lots of bacteria;
2. Severe necrotizing acute chorioamnionitis with bacteria;
3. Chorioamnionitis with fresh decidual hemorrhages; villi immature with overwhelming septicemia everywhere, also focally extending into villous parenchyma (rods);
4. Placenta with fresh retroplacental and intervillous hemorrhages; abruption; massive fetal septicemia with acute villitis, villous karyorrhexis;
5. Immature placenta with massive bacterial growth in fetal blood stream, bacteria in maternal blood in intrvillous space; acute villitis, focal; bacteria in villous parenchyma as well; bacteria gram negative on gram stain.

Diagnosis:
1. Immature placenta, 70 gm, with severe acute necrotizing bacterial chorioamnionitis with overwhelming bacterial growth in fetal blood vessels (septicemia) and maternal intervillous space;
2. Fresh retroplacental hemorrhages, decidual hemorrhages, intervillous hemorrhages and blood clot, 2.8 cm, features of premature placental separation;
3. Extremely premature, severely macerated, stillborn male fetus with fused eyelids, dusky cord, and placental villi showing intravascular karyorrhexis; fetal death in utero due to overwhelming bacterial sepsis due to gram negative bacterial rods, and,
4. Gram stain of the placenta shows bacteria to be gram negative rods.


Interpretation:
1. This was a severe, necrotizing acute chorioamnionitis with overwhelming bacterial sepsis in the fetal blood vessels of the immature placenta. The severe extent of the infection with suppuration, necrosis, and massive bacterial growth in the fetal blood vessels of the placenta implies that the infection had been present a number of days, at least 2-3, prior to delivery.
2. The fetal death in utero was due to massive fetal sepsis (blood stream infection). The infection was so overwhelming that fetal death in utero occurred before there was any fetal inflammatory response to infection— no funisitis or chorionic vasculitis.
3. Based on the severe degree of maceration and duskiness of the umbilical cord, the fetus had been dead in utero a number of days prior to delivery.
4. The gram negative rod bacteria that caused the fetal death in utero were present in the mother's blood stream of the placenta at the time of delivery on 9/29/2011.
5. Cultures of the maternal and fetal surfaces of the placenta and vaginal cultures grew out E. coli. Initial gram stains of these sites showed moderate gram negative bacilli and rare neutrophils. This implies that there was only a minimal response to the infection in the vagina and the maternal surface of the placenta.
6. Subsequent maternal blood cultures also showed the bacteria to be E. coli.
7. The mother died as a result of severe septic shock, DIC, E. coli bacteremia, and endometritis.


I hold the above findings to be true to a reasonable degree of medical certainty. I reserve the right to amend these findings as additional information become available.

Sincerely,

Janice M. Lage, MD
Pathologist

**Expert Witness Statement of David J. Feola**
Robert A. Flaugher v. Cabell Huntington Hospital, Inc., et al.

David J. Feola, Pharm.D., Ph.D.
Associate Professor, Department of Pharmacy Practice and Science
University of Kentucky College of Pharmacy
Biopharm Complex, 789 S. Limestone Street Room 231
Lexington, KY  40536
(859) 323-8751
david.feola@uky.edu

**Expertise**

I am a pharmacist and Associate Professor at the University of Kentucky College of Pharmacy. I received my Doctor of Pharmacy degree in 1997 from the University of Kentucky College of Pharmacy and was licensed in the Commonwealth of Kentucky in 1997 (License Number 011434).  After practicing as a clinical and staff pharmacist at the Appalachian Regional Healthcare Regional Medical Center in Hazard, KY from 1997-1998, I resumed my training through Residencies in Pharmacy Practice and Infectious Diseases Pharmacotherapy.  I then joined the Graduate Program in Clinical and Experimental Therapeutics at the University of Kentucky College of Pharmacy and obtained my Doctor of Philosophy in 2005.  I teach infectious diseases pharmacotherapy and I maintain clinical and staff pharmacist duties on a part-time basis.  Through my education, training, and experience I am familiar with the standard of care for pharmacy services.  I am an expert in the pharmacotherapy of infectious diseases as it applies to antimicrobial utilization in the treatment of bacterial infections, antimicrobial susceptibility testing and resistance, as well as the pharmacokinetics and pharmacodynamics of antimicrobial agents.  I have clinical experience in providing pharmacokinetic dosing of antibiotics consistently for the past 24 years.

I was retained by Bailes, Craig & Yon, PLLC to review the case and medical evidence concerning the care of Shahnaz Rumman at Cabell Huntington Hospital for her stay which initiated on September 28, 2011.  This is the first time that I have provided deposition or testimony in a court case.

**Case Summary**

Shahnaz Rumman is a 37 year old female who presented to Cabell Huntington Hospital on 9/28/11 with complaints of fever, chills, vomiting, and headache.  At this time she was G5P1 and currently 17 weeks and 6 days pregnant, with a history of in vitro fertilization, hypothyroidism, and gestational diabetes.  She was admitted through the OB Triage area to Labor and Delivery and over the course of the first night displayed signs of fetal demise, sepsis, and disseminated intravascular coagulation.  At 2226 on 9/28/11 she was prescribed gentamicin 110mg IV every 8 hours and clindamycin 900mg IV every 8 hours.  The patient was then transferred to the intensive care unit (ICU) at 0015 on 9/29/11.

She delivered a stillborn infant at 0236 following induction by misoprostol administration at 2335.  There is a question as to whether the initial dose of gentamicin was administered to the patient, as the Medication Administration Record shows an absence of documentation.  Ampicillin was added to the antimicrobial regimen and the patient received the first ampicillin dose at 0245.  The patient's clinical status deteriorated over the next few hours, and intubation



**EXHIBIT**

3

was required at 0841 on 9/29/11.  From a vaginal culture, Gram stain results revealed a moderate number of Gram negative bacilli as reported on 9/29/11 at 1059.  The organism was identified as *E. coli*, which tested resistant to ampicillin and tetracycline, but susceptible to all other agents tested.  During the morning of 9/29/11 gentamicin dosing was changed from conventional dosing to the extended interval (or "once-daily") administration technique.  Aggressive therapy was required for maintenance of her blood pressure.  Based upon clinical course of susceptibility results, subsequent antimicrobial therapy was changed to other agents including piperacillin/tazobactam and imipenem/cilastatin.  The patient experienced a complicated course including multi-organ failure, and died on October 2, 2011.

### Documents Reviewed

To prepare this report, I reviewed the medical chart of Shahnaz U. Rumman; the expert witness reports from the Plaintiff; written policies from Cabell Huntington Hospital (Medication Process Policy and Medication Administration Policy); pharmacy records from Cabell Huntington Hospital including the pharmacy software data that mirrors the Medication Administration Record, and the Action/Dispense/Verification history; and depositions from Dr. David Jude, Brenda Brown, RN, Dr. Jennifer Confer, Lisa Midkiff, RPh, Rubina Ahmed, Dr. Hoyt Burdick, Y. Alexis Daugherty, RN, Amanda Elswick, Dr. Jessica Granger, Dr. Christine Gutierrez, Kazi Hossain, Dr. Randy Kinnard, and Whitney Pinkerton, RN.

### Opinions

The following points are my opinions to a reasonable degree of medical certainty:

1.  Based upon the timing of order generation, order entry, and dispensing, the actions of the pharmacists in dispensing antimicrobial agents to the patient were appropriate.  The timing of medications by the pharmacy computer system was described by the testimony of the pharmacist Lisa Midkiff.  The pharmacy system rounds the administration time of the doses to the nearest hour.  This is common practice, and although the computer program rounded the time of the antibiotic scheduled doses, this did not delay antimicrobial therapy.  Although a time is generated by the system, once a medication is available in the patient care units, it can be administered immediately, even if given earlier than the time indicates.  This is a common occurrence for first doses of medications.  It is also a routine practice in hospital pharmacies to perform the duties of order verification, labeling, and dispensing as described.  The pharmacy computer software determines the number of dose labels to be printed, and either a portion or all of the doses were prepared and sent from the pharmacy as described in Ms. Midkiff's deposition.  Pharmacy computer systems commonly dispense multiple doses of medications in conjunction with the time that an order is entered as it relates to the daily delivery of medication batches.

2.  Based on testimony from Brenda Brown and the pharmacy records, it is more likely than not that the initial gentamicin dose that was not charted, around the time of 0100 on 9/28/11, was given.  This is based upon the timing of the dispensing of gentamicin from the pharmacy, the testimony from Ms. Brown concerning the initiation of a second IV line, her memory of not finding an absence of the initial gentamicin IV when hanging the second bag at 0617, and the return records from the pharmacy that charged for 5 gentamicin doses and then credited back only 3.

3.  Although serum concentrations of gentamicin were obtained, these data cannot be utilized in this case to determine whether the initial gentamicin dose in question was administered.  The

first gentamicin serum concentration was drawn on 9/29/11 at 2130 with a resultant value of 6.1 mcg/ml. By that time the patient had been switched to extended interval dosing and had received a dose of gentamicin 380mg IV on 9/29/11 at 1036. This, combined with her fluctuating renal function and altered volume of distribution, makes it not possible to determine the amount of drug received prior to the first extended interval dose administration.

4.   Standard of care was followed in terms of the dosing and selection of antimicrobials. Typical regimens described in the literature include the common combination of a beta-lactam (ampicillin), clindamycin, and gentamicin—the regimen that was initiated in this case (Barton JR et al. Obstet Gynecol Sept 2012;120(3):689-706). Traditional aminoglycoside dosing was initiated at approximately 1.7mg/kg of gentamicin. While extended-interval (or "once daily") aminoglycoside dosing is considered more effective, it is not typically employed during pregnancy, as pregnancy is generally considered a contraindication to this dosing method (Freeman CD et al. J Antimicrob Chemother 1997;39:677-86). Once the patient was no longer pregnant, dosing of the gentamicin was changed to an extended interval regimen at approximately 7mg/kg based on an adjusted aminoglycoside dosing weight. The dosing interval was extended to q36h due to the patient's decrease renal function at that time. Gentamicin concentrations were also drawn appropriately. If the patient had continued upon the initial traditional dosing interval, a trough would not have appropriately been obtained until before the third or fourth dose, allowing the gentamicin concentration to achieve steady-state. As culture and susceptibility results provided additional information, the antibiotic regimen was appropriately broadened to include piperacillin/tazobactam, and later imipenem/cilastatin.

My opinions in this report are expressed to a reasonable degree of medical certainty, based on materials provided to me to date. This report is generated in good faith, and I reserve the option to amend these opinions in the event that additional information regarding the case becomes available.

David J. Feola, Pharm.D., Ph.D.

October 28, 2014

Richard Brandon Frady, MSN, RN, ACNP-BC, CMC
2201 Fellowship Court
Tucker, Georgia 30084

Qualification:

I have been a registered nurse for 18 years and 4 months as of October 2014. I graduated in 1996 from Presbyterian Hospital School of Nursing with a Diploma in Nursing and then in 2006 from Emory University with a Master's of Science in Nursing with a specialization in Critical Care. My career has encompassed direct clinical care of critically ill patient, clinical nursing management of critical care environment including medical, surgical, neurological, and obstetrical critical care, finally I have functioned as a clinical nurse specialist for critical care and cardiology. My most recent practice in critical care is as Critical Care Nurse practitioner caring for critically ill medical, surgical, and obstetrical patient population. I have extensive knowledge of the standards of practice set forth by the American Association of Critical Care Nurses.

List of Documents / Materials Reviewed:

1)  Cabell Huntington Hospital, Inc. Medical Record for Dr. Shahnaz Rumman
2)  Gentamicin Dispensing Report
3)  Cabell Huntington Live Directory Report
4)  Notice of Claim- Date: 08/23/2013
5)  Certificates of Merit – Date: 08/23/2013
6)  Amended Complaint – Date: 05/29/201
7)  Answers to Amended Complaint 06/12/2014
8)  Expert and Disclosures – Date: 09/25/2014
9)  Lisa Midkiff – Pharmacist – Date: 09/17/2014
10) Brenda Brown – Registered Nurse – Date: 09/12/2014
11) Title 19 Legislative Rule  Board of Examiners For Registered Professional Nurse Series 10
12) Whitney Pinkerton – Registered Nurse – Date: 09/12/2014
13) Jennifer Confer – Pharmacist – Date: 09/12/2014
14) Dr. David Jude – Physician – Date: 09/10/2014
15) Dr. Randy Kinnard – Physician – Date: 09/10/2014
16) Y. Alexis Daugherty – Registered Nurse – Date: 09/12/2014
17) Dr. Jessica Granger – Physician – Date: 09/10/2014
18) Amanda Elswick – Nursing – Date: 09/12/2014
19) Dr. Hoyt Burdick – Physician – Date: 09/12/2014
20) Dr. Christine Gutierrez – Physician – Date: 09/15/2014
21) Rubina Ahmed  - Date: 08/04/14
22) Kazi Hossain – Date: 08/14/2014

Summary of Events:

Dr. Rumman a 37 year old female presented to the emergency department at Cabell Huntington Hospital and was directed to the obstetrical triage unit. She had complaints of fever, headache, and vomiting. Her initial vital signs were: temperature 102.8 orally, heart rate 120 beats per minute, systolic blood pressure 91 mmHg and diastolic blood pressure 67 mmHg. At 19:53 on 09/28/2011; during the triage process fetal heart tones were assessed and were not obtainable by Doppler. A fetal ultrasound



was ordered and completed and Dr. Rumman was found to an intrauterine fetal demise. An obstetrical / gynecological (OB/GYN) consult was requested and completed for dilation and evacuation of fetus related to septic abortion. Dr. Rumman was transferred to the Labor and Delivery unit at 22:33 on 09/11/2011. Dr. Rumman continued to have elevated heart rate, low blood pressure, and elevated lactate. She was started on antibiotics 09/28/2011 at 23:30. She was transferred to the intensive care unit (ICU) 09/29/2011 at 00:15. On arrival to ICU she continued to have alterations in her vital signs heart rate 132 beats per minute, respiratory rate of 28 breaths per minute, systolic blood pressure 72 mmHg, diastolic blood pressure 40 mmHg, mean arterial pressure 51mmHg, and elevated lactate 4.23. Her initial nursing assessment on arrival to the ICU demonstrated a restless patient with blue dusky skin, thread 1+ pulses in posterior tibial and dorsalis pedis, and moderate agitation. Additional on arrival to the ICU the nurse placed additional intravenous lines to facilitate care that was ordered by the physician. She was given multiple medications to stabilize her including antibiotics, intravenous fluid administration per physician orders. Despite the maximal care provided Dr. Rumman continued to deteriorate and required intubation at 07:20 on 09/29/2011. She was started on norepinephrine infusion for blood pressure (09:55 on 09/29/2011), vasopressin (09/29/2011 13:02), and neosynephrine (09/29/2011 16:04). Over the next 4 to 5 days she continued to require multiple medications to support her blood pressure. Also she required continuous renal replacement therapy. On 10/02/2011 she developed pluseless electrical activity and required cardiopulmonary resuscitation on two separate occasions. During the second resuscitation attempt Dr. Rumman did not have a return of spontaneous circulation and was pronounced dead 10/02/2011 at 13:22.

Basis and Facts for Opinions:

I have reviewed the listed documents above. I also rely on clinical critical care experience and education and training of sepsis patient admitted to the critical care unit comparable to Dr. Rumman.

Opinions:

I hold the following opinions to a reasonable degree of nursing certainty. They may be modified by additional information discovered as the case continues.

1) Nursing care rendered in the ICU was consistent with standards of care for sepsis patients. Additional intravenous lines were established upon Dr. Rummans arrival to the ICU in anticipation of multiple antibiotics and other medications as ordered by the physician. The nursing staff demonstrated care planning and anticipation of implementation of needed medical strategies to support Dr. Rumman during her admission to the ICU as ordered by the physician.

2) Additionally, I am of the opinion that the nursing care meet the standard of care in accordance with the Surviving sepsis campaign (2008 recommendations) as evidence by frequent nursing assessments , vital signs, laboratory / diagnostic studies as ordered by the physician, and immediate interventions to ensure safe care to stabilize Dr. Rumman.

3) The standard of nursing care set forth in the West Virginia standards for professional nursing practice was met and exceeded on the care of Dr. Rumman.

Publications in Last Ten Years:

I have not published in last ten years.

**Compensation Rates:**

See Attachment 1

**Testimony History:**

I have not provided testimony, depositions, or opinions in the last four years.

Richard Brandon Frady

11 / 1 / 2014

Date

2014-11-03 06:55 mfa dept of medicine          2027412241 >>        304 697 4714  P 2/3

6317 Newburn Drive
Bethesda, MD 20816

November 2, 2014

Rebecca C. Brown
Bailes, Craig & Yon
401 10th Street, Suite 500
P.O. Box 1926
Huntington, WB 25720-1926

Re: Flaugher v. Cabell Huntington Hospital

Dear Ms. Brown:

I have been asked to review records from the above matter for issues of causation. I am a tenured Professor of Medicine, in the Division of Infectious Diseases, at the George Washington University School of Medicine and Health Sciences. I have been employed in that position for over 30 years and have broad exposure to the clinical issues in this case. I have reviewed the followed materials for this report:

Notice of claim
Amended complaint
Certificate of merit
Plaintiff's expert disclosures and supplemental disclosures

Records Cabell Huntington Hospital
Pharmacy gentamicin dispensation log

Deposition Dr. Jude
Deposition Ms. Brown
Deposition Ms. Pinkerton
Deposition Ms. Elswick
Deposition Dr. Granger
Deposition Dr. Gutierrez
Deposition Dr. Kinnard
Deposition Ms. Ahmed
Deposition Ms. Confer
Deposition Ms. Daugherty
Deposition Ms. Ahmed

Dr. Rumman was a 37 year old physician admitted to Cabell Huntington Hospital on 9/28/14. Her initial vital signs (temp 102.8, BP 91/67, P 127) were indicative of sepsis. Premature rupture of membranes at 17 weeks of pregnancy lead to "severe necrotizing chorioamnionitis" and E. coli bacteremia. It is likely that fetal infection had been present for greater than 24 hours because of "a severe degree of

EXHIBIT
5

maceration" of the fetus and the fact that the fetal vessels of the placenta were "completely overrun by Gram-negative bacilli", and "which completely obscures the lumen of the fetal vessels within the placenta". The overwhelming nature of the Gram-negative bacteremia is reflected in the rapid time (9 hours) to blood culture positivity. Within hours she developed an elevated serum lactate of 4.23 indicative of poor tissue perfusion and profound neutropenia with an absolute neutrophil count of 700. Within several more hours there was disseminated intravascular coagulation (platelet count 25,000), acute kidney injury (creatinine from 0.55 to 1.14), and respiratory failure. She died in less than 96 hours, and a blood culture drawn on 10/1 remained positive for E. coli.

It is my opinion to a reasonable degree of medical certainty that the overwhelming nature of this infection led to her demise, that the diffuse inflammatory/cytokine process had already been triggered at the time of admission, and that antimicrobial therapy could not have reversed this process. It is more likely than not that she would have died no matter what treatments were provided.

Sincerely,

David M. Parenti, MD, FACP, FIDSA

FRANCILLA A. THOMAS, RNC-OB, MSN, C-EFM

64 TREMONT TERRACE

WANAQUE, N.J. 07465

I am a Master's prepared Registered Nurse with over 25 years of clinical experience in Obstetrical Nursing.

I have served as a Nursing Expert Witness for cases in Maryland, Chicago, Atlanta, Kansas City and Houston Texas. To the best of my knowledge I have not provided trial or deposition testimony in the last four years.

I have been retained by Bailes, Craig & Yon, PLLC to review the nursing care provided to Dr Shahnaz Rumman from her admission to OB Triage to her admission to the Intensive Care Unit.

I have read the depositions of Whitney Pinkerton, Amanda Elswick, Brenda Brown, Y. Alexis Daugherty, Jennifer Confer, Lisa Midkiff and Doctors Christine Gutierrez, Jessica Granger, David Jude, Randy Kinnard and Hoyt Burdick. I have also reviewed the medical records and charting of treatment and care rendered to Dr Shahnaz Rumman.

Dr Rumman was a 37 yr old G5 P1031 with an EDC 3/4/12 who came to the OB Triage on 9/28/11 with chief complaint of fever, she had a gestational age, at that time, of 17 weeks 3 days. Documentation showed that at 18:38 Dr Rumman was shown to a triage room and instructed on gown placement and clean catch urine collection, this was documented as being sent to the lab at 18:49 for urinalysis. At 18:50 vital signs were taken showing T102.8 [oral], HR 120, Resp 16, BP 91/67. Documentation by the Triage Nurse at this time showed not only was the patient complaining of fever but a headache also and stated she took Tylenol that morning, the Nurse further documented the patient's denial of any abdominal pain, loss of fluid or vaginal bleeding and Dr Granger was notified. 19:40 an IV was started and Lactated Ringers hung, blood drawn and sent to the lab.



Documentation also showed she received Tylenol 1000mg po at 19:30 and Zofran 4mg IVP at 19:43

19:53 the Triage Nurse unable to obtain Fetal Heart Tones with Doppler informed Dr Gutierrez who performed a bedside ultrasound at 20:02 and was unable to visualize FHT and ordered an official ultrasound. At 20:40 Dr Rumman was taken to Ultrasound where a demise was confirmed and returned to Triage at 21:15, Dr Gutierrez was notified of her return. 22:00 Drs Jude and Gutierrez at bedside discussing plan of care and 22:18 sterile speculum exam was done, notes indicated (+) fluid in the vagina (+) foul smell (+) nitrazine (+) fern and a 3cm dilated cervix.

Of note when Dr Rumman was seen by Dr Gutierrez, she complained of emesis since 15:00 and stated she felt she had an episode of fluid leaking briefly the day before.

At 22:26 orders were placed by Dr Gutierrez for Gentamicin 110mg IVPB Q8H and Clindamicin 900mg IVPB Q8H. Documentation in the MAR shows Clindamicin was given by Y. Alexis Daugherty RN at 23:30 on 9/28/11 and charted at 00:09 on 9/29/2014. Gentamicin is not documented until 06:17 on 9/29/11 by Brenda Brown RN.

At 22:33 orders were received to transfer patient to LDR and patient was transferred at 22:47. On admission to LDR the nurse noted Dr Rumman to be alert and oriented x 3, respirations even and unlabored, no SOB, or chest pains, IV infusing as ordered and several family members at bedside. At 23:25 she is up to the bathroom, at 23:35 Misoprostol 200mcg inserted per vagina by Dr Gutierrez. At 23:50 Dr Gutierrez discussing with patient and family move to SICU, telephone report was given at 00:05 and patient was transferred at 00:15.

I believe that the standard of care for reasonably prudent nurses was met by the nursing staff.

1. Dr Rumman presented to OB Triage and was admitted, as per admitting office, at 6:25pm and within 25 minutes was shown to a triage room by a

nurse and had a nursing assessment done which entailed getting a history, taking her vital signs and obtaining a specimen of urine for urinalysis

2. Standard of care was met when the Triage Nurse, in a timely manner, notified the physician about the patient's admission to triage.

3. Standard of care was met when the Triage Nurse implemented the orders to address the patient's immediate needs i.e. starting an IV, administering Tylenol and Zofran as ordered.

4. Standard of care was met when the Triage Nurse used her nursing judgment and prioritized care for her patient i.e it was more prudent to address the elevated temperature and vomiting of Dr Rumman at that time than trying to find Fetal Heart Tone on a 17 week gestational patient who is vomiting.

5. The LDR Nurses administered the antibiotic Clindamicin as soon as the order was received and the medication became available

6. Nurse Brown testified in her deposition to remember removing the empty Gentamicin bag before hanging the dose at 06:17, and although she may have forgotten to chart the medication, she testified to what is her practice.

It is my opinion that the OB Triage and LDR Nurses did what any prudent and reasonable nurse would do under the same or similar circumstances

*FAThomasRNC*

1) I am a licensed physician actively practicing medicine in the state of Kentucky. I received my medical degree from the University of Kentucky College of Medicine in 2003. I completed a residency in emergency medicine at the University of Kentucky from 2003-2006. I am board certified in emergency medicine by the American Board of Emergency Medicine since 2007. I have been practicing emergency medicine for over 8 years.

2) I have reviewed the medical records from the visit of Shahnaz Rumman from Cabell Huntington Hospital.

3) Based upon my training and expertise in emergency medicine, I am familiar with the standard of care for triage of emergency medicine patients including those with obstetric emergencies.

4) Based upon my education, training, expertise, familiarity with standard practices at academic hospitals, and my review of the patient chart, I do not believe that the staff at Cabell Huntington Hospital deviated from the standard of care in their designation of Shahnaz Rumman as most appropriate for emergency care at the obstetric triage area of the hospital.

5) The opinions expressed above are to a reasonable degree of medical probabilty that this was not a deviation of the standard of care. The opinions are based wholly upon the materials available to me at the time I performed my review of this matter. I reserve the right to review any documents or materials which may be later generated and/or supplied to me and supplement or amend the above opinions as might be appropriate, in my professional opinion.

6) I do not have a financial interest in the outcome of this litigation.


Brian Adkins MD



EXHIBIT
7