IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

ROBERT A. FLAUGHER, as Administrator of the
Estate of Shahnaz Rumman,

                          Plaintiffs,

v.                                                    Case No. 3:13-CV-28460

CABELL HUNTINGTON HOSPITAL, INC.,
UNIVERSITY PHYSICIANS & SURGEONS, INC.,
MARSHALL UNIVERSITY BOARD OF GOVERNORS,
JESSICA K. GRANGER,
CHRISTINE V. GUTIERREZ,
DAVID C. JUDE,
RANDY S. KINNARD,
BRENDA BROWN; and
Y. ALEXIS DAUGHERTY,

                          Defendants.

## DEFENDANTS', UNIVERSITY PHYSICIANS & SURGEONS, INC., MARSHALL UNIVERSITY BOARD OF GOVERNORS, JESSICA K. GRANGER, CHRISTINE V. GUTIERREZ, DAVID C. JUDE AND RANDY S. KINNARD'S DISCLOSURE OF EXPERT WITNESSES PURSUANT TO RULE 26(A)(2)

COME NOW the defendants, University Physicians & Surgeons, Inc.,

Marshall University Board of Governors, Jessica K. Granger, Christine V.

Gutierrez, David C. Jude and Randy S. Kinnard, by counsel, D.C. Offutt, Jr., Anne

Liles O'Hare, and Offutt Nord Burchett, PLLC pursuant to the Court's Scheduling

Order and discloses the following expert witnesses who may be called at the trial of

this matter:

      1.  Angela T. Bianco, M.D., FACOG
          42 Knoll Road
          Tenafly, NJ 07670



PLAINTIFF'S
EXHIBIT
10

Dr. Bianco is a board certified Maternal Fetal Medicine specialist.   Dr. Bianco's Curriculum Vitae is attached hereto and marked as Exhibit A.  Dr. Bianco charges $400.00 per hour for review of documents and $3000.00 per day for trial testimony, plus expenses.  She is expected to testify that based upon her education, training, experience and a review of the records in this case, that the care and treatment rendered to Shahnaz Rumman by Dr. Granger, Dr. Gutierrez, Dr. Kinnard and Dr. Jude met the applicable standard of care and that these physicians used appropriate clinical judgment in their diagnoses and treatment of Shahnaz Rumman during the time period which is the subject of this action. Dr. Bianco's opinions are more fully set out in her opinion letter attached hereto as Exhibit B.

2.  Roger A. Griffith, MBA, CPA, CFP, CLU, ChFC, PFS, CVA, ABV, CFF
Gray, Griffith & Mays, A.C.
707 Virginia Street, East
Suite 400
Charleston, WV 25301

Mr. Griffith is an Economist with more than forty (40) years of experience in public accounting.  His Curriculum Vitae is attached hereto and marked as Exhibit C.  Mr. Griffith charges $250.00 per hour for work done by a Director, $145.00 per hour for work done by Staff and $75.00 per hour for Clerical work.  He is expected to testify regarding the expected economic losses as the result of Dr. Rumman's death. Mr. Griffith's opinions are more fully set out in his report attached hereto as Exhibit D.

3. Janice M. Lage, M.D.
   Department of Pathology
   University of Mississippi Medical Center
   2500 North State Street
   Jackson, MS 39216

Dr. Lage is a board certified Pathologist who is a Professor and Chair of the Pathology Department at the University of Mississippi Medical Center. Her Curriculum Vitae is attached hereto and marked as Exhibit E. Dr. Lage charges $600.00 per hour for case/pathology slide review, $2,500.00 per half day for Deposition Testimony and $600.00 per hour plus expenses for trial testimony. Dr. Lage is expected to testify as to causation in this case, based upon her education, training, experience and a review of the pathology slides in this case. Dr. Lage's opinions are more fully set out in her opinion letter, attached hereto as Exhibit F. Dr. Lage is a shared expert with co-defendants.

4. David C. Jude, M.D.
   1600 Medical Center Drive
   Huntington, WV 25701

Dr. Jude is a board certified Obstetrics and Gynecology physician. He is expected to testify in keeping with his deposition taken in this matter, including, but not limited to his testimony, that he met the standard of care in his treatment of Shahnaz Rumman.

5. The defendants reserve the right to present expert testimony offered by any expert witness identified by the plaintiff, whether that expert is actually called to trial as a witness for the plaintiff or not.

The defendants reserve the right to supplement this Expert Witness

Disclosure as discovery continues.

                                        **UNIVERSITY PHYSICIANS &
                                        SURGEONS, INC. and MARSHALL
                                        UNIVERSITY BOARD OF GOVERNORS,
                                        JESSICA K. GRANGER, CHRISTINE V.
                                        GUTIERREZ, DAVID C. JUDE, RANDY
                                        S. KINNARD
                                        BY COUNSEL**


*/s/ D.C. Offutt, Jr.*
D.C. Offutt, Jr., Esquire (WV Bar No. 2773)
Anne Liles O'Hare, Esquire (WV Bar No. 9171)
***Offutt Nord Burchett, PLLC***
949 Third Avenue, Suite 300
P.O. Box 2868
Huntington, West Virginia  25701
(304) 529-2868 - Office
(304) 529-2999 - Facsimile
dcoffutt@onblaw.com
alohare@onblaw.com

Angela T. Bianco, M.D., FACOG
42 Knoll Road
Tenafly, NJ 07670

October 29, 2014

Anne O'Hare, Esquire
Offutt Nord Burchett PLLC
949 Third Avenue, Suite 300
Huntington, WV 25728

Re: Estate of Shahnaz Rumman v. Cabell Hunting Hospital, Inc., et al.


Dear Ms. O'Hare:

I have reviewed the above-captioned case and offer the following:

By way of background, I am a board certified Obstetrics and Gynecology Physician with a specialty in Maternal Fetal Medicine. I have been practicing for approximately 15 years, after completing my fellowship at Mount Sinai Medical Center in Maternal Fetal Medicine.

I reviewed the following materials in preparation for this report:

1. Cabell Huntington Hospital Medical Records Pertaining to Shahnaz Rumman
2. Medical Records from Dr. Sarah Price Pertaining to Shahnaz Rumman
3. Notice of Claim
4. Screening Certificate of Merit
5. Complaint
6. Deposition Transcripts for Drs. Kinnard, Jude, Gutierrez and Granger
7. Plaintiff's Expert Witness Disclosures

Brief Medical Summary

Dr. Rumman was a 37 year old patient at 17 3/7 weeks gestation with a history of hypothyroidism and pre-gestational diabetes when she presented to the Cabell Huntington OB Triage on September 28, 2011. She complained of nausea, vomiting and chills since 1500 that day.

Her obstetrical history was remarkable for a term delivery via caesarian section in 2004, complicated by postoperative endometritis, as well as two spontaneous first trimester abortions.

Her gynecologic history was remarkable for infertility, as well as two ectopic pregnancies.

Her surgical history included a prior D&C as well as salpingectomy in 2007.

She was triaged in OB Triage at 1849.

Her vital signs on presentation were as follows:
- Temperature: 102.8
- Pulse: 120
- Respirations: 16
- Blood Pressure: 91/67
- Body Mass Index: 27

Dr. Granger is the first physician (2nd year resident) to evaluate Dr. Rumman. She ordered Tylenol, Zofran, IV Fluids, CBC, urinalysis, glucose level, and fetal heart rate assessment. Nurse Pinkerton, at 1953, was unable to auscultate a fetal heart tone. Therefore, Dr. Gutierrez, the senior resident, was notified.

Dr. Gutierrez (third year resident) evaluated Dr. Rumman at 1953, confirming that no fetal heartbeat was auscultated or visualized. An "official" ultrasound was ordered to confirm fetal death.

Dr. Gutierrez also ordered a second CBC, Comprehensive Metabolic Panel, blood cultures, and coagulation studies. Dr. Gutierrez at that time documented that Dr. Rumman had a nontender abdomen.

At 2040, Dr. Rumman was taken to Radiology for an "official" ultrasound.

At 2101, fetal death was confirmed by ultrasound.

At 2218, a physical exam was performed including a Sterile Speculum Exam which revealed a dilated cervix with bulging membranes, and malodorus/purulent fluid in the vagina.

At 2220, Dr. Jude wrote a note as follows: Pelvic-uterus nontender, malodorous fluid, Imp/Rec-Choriamnionitis/Sepsis/IUFD, plan IV antibiotics and cytotec

At 2226, gentamicin/clindamycin ordered by Dr. Gutierrez.

At 2330, Dr. Gutierrez wrote a note denoting lab results: the White Blood Count was 1.4, Hematocrit 29.6, Platelet Count 158, HCO3 16.5, lactate 4. Her impression was sepsis, with plan for misoprostol, IV gentamicin/clindamycin, IVF boluses and cultures

Clindamycin was given at 2330.

Gentamycin was ordered at 22:46 but the MAR does not reflect administration until 0617 on 9/29/2011

At 2340, Dr. Rumman was transferred to the ICU due to hypotension. Upon arrival she was evaluated by Dr. Kinnard, who added ampicillin to the regimen. This was ordered at 0115 on September 29, 2011 and given at 0246.

At 0305 on September 29, 2011, Spontaneous Vaginal Delivery of nonviable fetus and placenta occurs. The note states IVF/antibiotics per ICU team.

Cultures return with gram negative bacillus at 0700

At 0725 the patient's abdomen is distended.

At 0841, she was intubated.

At 1025, it was noted that the patient was oliguric on pressors.

At 1100, the Infectious Disease Physician changed antibiotics to Zosyn and single dose gentamycin, and the clindamycin and ampicillin were discontinued.

At 2111, Primaxin was ordered.

On September 30, 2011, she was diagnosed with ARDS and renal failure.

On October 1, 2011, she experienced ventricular tachycardia.

On October 2, 2011, Dr. Rumman was in refractory septic shock, experienced disseminated intravascular coagulation, renal failure and her pupils were noted to be fixed/dilated.

Dr. Rumman expired on October 2, 2011 due to multisystem organ failure.

Final cultures showed E coli, sensitive to gentamycin.

My comments regarding the opinions expressed by the Plaintiff's experts are as follows:

## Dr. Kenneth Larsen

Dr. Larsen's statement that Dr. Gutierrez did not meet the standard of care due to a lack of sepsis recognition, is not valid given the WBC of 1.4 had not returned, and the observed blood pressure on presentation is common in the second trimester of pregnancy. Furthermore, the patient's self-reported primary complaint was nausea and vomiting, and being a healthcare provider, the possibility of a viral illness was high due to her potential exposure to sick contacts. She did not admit to vaginal loss of fluid until an SSE was performed (which in interrogatories Dr. Gutierrez states that Dr. Rumman initially declined and wanted her nausea and vomiting treated first). Her tachycardia was initially attributed to a fever and it is important to note that the average pulse in pregnancy is 10/15 beats per minute higher than in the nonpregnant state.

Dr. Larsen's statement regarding severe sepsis based on lab work is incorrect. At the time the lactate resulted, broad spectrum antibiotics and IV fluids were already ordered.

Dr. Larsen's statement that Dr. Rumman presented with sepsis and fetal demise, and not a life threatening condition, is erroneous as sepsis is a life threatening condition.

Dr. Larsen further states that Dr. Jude did not meet the standard of care by recognizing and treating sepsis accordingly. However, Dr. Jude did order IV fluids as well as antibiotics within the recommended time period according to the 2008 Stop Sepsis Campaign guidelines that were in place at that time.

## Dr. William Roberts

Dr. William Roberts states sepsis in pregnancy may be insidious and patients do not present critically ill, and that death occurs in over 25% of cases (he cites Clinics NA 2007 (34) 459), which contradicts Dr. Larsen's opinion that Dr. Rumman's condition was not life threatening.

Dr. Roberts faults nurse Brenda Brown for failing to recognize that gentamycin was ordered but had not been administered, when during interrogatories nurse Brown recalls that she did in fact administer the gentamycin but neglected to scan it into the MAR system during the transition of care from the labor floor to the ICU.

Dr. Roberts states that the E-coli organism that was identified was resistant to clindamycin and that the only antibiotic that the E-coli strain that grew was sensitive to was gentamycin. Dr. Roberts is incorrect as the very article he references (ObGyn Clin NA 34 (2007) 459-79) clearly states that intra amniotic infections are typically poly microbial, rarely do organisms actually grow in specimen cultures and should always be treated with broad spectrum, not single agent antibiotic therapy.  Dr. Roberts states the presence of a fetal death should have led them to a diagnoses of septic abortion.  She did not have a septic abortion by definition, she had a severe intra amniotic infection, with likely overwhelming fetal infection, leading to fetal death.  The term 'septic abortion' is used when describing infection after an attempted pregnancy termination.

In fact, fetal death is uncommon with intra amniotic infection and the fact that she presented with fetal death suggests she was infected for a significant amount of time prior to presentation.

Dr. Roberts cites Crit Care Med 2006 :34: 1589 that each hour after diagnosis of septic shock is associated with a7% increase in mortality. In all likelihood, Dr. Rumman was probably septic prior to her arrival at Cabell Huntington, based on the fetal death, the rapidity with which an organism was identified and the evidence of overwhelming infection on placental pathology. However, as he cites, sepsis is difficult to diagnose in the obstetric patient as they are typically able to compensate until severe sepsis or septic shock appears.

Dr. Roberts states antibiotics should have been ordered stat, however antibiotics are not typically ordered as a stat medication.

He cites Sibais paper but that clearly states that indicators of poor outcome include prior debilitating states, such as diabetes and thyroid disease, which Dr Rumman had.

### Dr. James Leo

Dr. Leo references a CHH policy regarding the care of obstetrical patients in the ER or on the labor floor depending on gestational age. However the policy stated patients with **nonpregnancy** related complaints <20wks gestation should be evaluated in the ER. Dr. Rumman in fact was suffering from a pregnancy related condition.

The delay in diagnosing fetal death is irrelevant. The diagnosis of IAI alone, even in the absence of fetal death is reason enough for uterine evacuation. Dr Leo talks about source control being a tenant of treating sepsis, in this case source control involved evacuation of the uterus which was delayed by Dr. Rumman's request to delay initial vaginal exam as well as the delay in initiating misoprostol induction at her request.

He states that even when following the algorithm from the Stop Sepsis campaign the mortality rate is up to 20%.

He states the patient did not receive effective antibiotics for 8.5 hours after the diagnosis of "severe sepsis" could have been made, which is approximately 10pm which is when, in fact, they did make the diagnosis.

### Dr Beigi (obgyn)

Dr. Beigi states that Dr. Rumman had clear evidence of SIRS upon initial presentation. It is again important to note that her leucopenia was not evident until just prior to Dr. Jude's evaluation. Furthermore the definition of SIRS has not been clearly elucidated in the pregnant population. As mentioned previously the BP and pulse requirements may differ in the pregnant population. Standard of care regarding fetal viability is not relevant at 17weeks, nor is it relevant to the management of this case.

The pathology report was c/w overwhelming infection which was obviously present at 230am when the placental delivery occurred and likely reflects that she had refractory sepsis at that time, as well as suggesting that her septic state was likely present prior to her arrival, but confounded by her pregnant state.

He states that Dr. Rumman's statements did not interfere with her outcome; however, I believe they were unintentionally obstructive.

The interrogatories state she refused initial pelvic exam, then refused misoprostol induction, which is the tenant of treatment of sepsis, that being source control.

She initially refused central line placement as well as foley catheter, undermining efforts at IVF resuscitation and hemodynamic status. She also undermined a diagnosis of severe sepsis by refusing ABG analysis.

Mr. Gaston quotes the CHH tip of the week regarding a small window of time to begin treatment for sepsis, however, Dr. Rumman was declining adequate treatment, including thorough initial exam and uterine evacuation.

It is my professional opinion that the treatment Dr. Rumman received while at Cabell Huntington Hospital was within the established standard of care in 2011. My opinions are given within a reasonable degree of medical probability. It is my opinion that Dr. Rumman was infected with a particularly virulent organism(s), her infection was likely severe upon initial presentation but was confounded due to her general good health, age and pregnancy. More than likely, her severe sepsis was refractory to antibiotic therapy and fluid resuscitative efforts, as her infection was overwhelming, as evidenced by clinical exam with the unusual finding of purulent fluid as well as placental pathologic findings.

I hold the foregoing findings and opinions to be true to a reasonable degree of medical probability. I reserve the right to amend these findings as additional information becomes available.

Very truly yours,

Angela T. Bianco, M.D., FACOG

Janice M. Lage MD
501 Chuck Wagon Dr.
Brandon, MS 39042

September 7, 2014

Rebecca C. Brown
Bailes, Craig & Yon, PLLC
401 10th Street, Suite 500
Huntington, WV 25720-1926

RE:  Estate of Shahnaz Rumman v. Cabell Huntington Hospital, Inc., et al

Dear Ms. Brown,

I have reviewed the above-captioned case and my report is as follows.

By way of background, I am a board-certified anatomic pathologist with subspecialty expertise in obstetric and gynecologic pathology, specifically, perinatal, placental, and neonatal pathology. I began my academic career at the Brigham and Women's Hospital, Boston, MA, in the Women's Division in 1984. At the Brigham and Women's Hospital, thousands of placentas were examined annually and over 120 perinatal (baby) autopsies were performed each year. I remained there for approximately 7 years. Subsequently, in 1991, I went to Georgetown University working as a general surgical pathologist and was the only placenta and perinatal autopsy pathologist. In 1999, I moved to the Medical University of South Carolina to take the position of Departmental Chairman. At MUSC, I served as the senior placenta and perinatal pathologist. In 2013, I moved to serve as Chairman of the Department of Pathology at the University of Mississippi Medical Center, Jackson, MS. I have given many nationally invited symposia and courses on placenta and perinatal pathology for all of the main pathology societies: United States and Canadian Academy of Pathology, the American Society of Clinical Pathologists, and the College of American Pathologists. I am a full Professor with Tenure and Chairman of the Department of Pathology at the University of Mississippi Medical Center. I serve as an expert consultant to practicing pathologists in the areas of obstetric and gynecologic pathology, and, more specifically, placental pathology, having over 25 years' experience in this subject.

I have reviewed the following materials:
1. Notice of Claim;
2. Certificate of Merit;
3. Complaint;
4. Chain of Custody signature sheet;

5.  Seven glass slides, labeled, 6441-11, sublabeled 1, 2, 3, 4, 5, 5 gram, and gram control;
6.  Final Surgical Report from Cabell Huntington Hospital, CS 6441-11, regarding placenta and gross examination only of fetus; and,
7.  A CD labeled Rumman, CHH records, 9/28/11 containing medical records of the mother from Cabell Huntington Hospital.

Brief Medical Summary:

The mother, Shahnaz Rumman, was a 37-year-old G5P1031 medical doctor who has a past medical history of previous cesarean section delivery (2004) and right salpingectomy (2007). This pregnancy was assisted by in vitro fertilization. She has a history of gestational diabetes on insulin control and hypothyroidism. She presented on 9/28/2011 at 17 weeks 6 days to her OB when her water broke. She had repeated vomiting since about 1500 that day. She was examined by her OB and an ultrasound was performed. A diagnosis of missed abortion was made as there was no fetal heart beat. She was noted to be febrile with a dilated cervix. IV Clindamycin and gentamicin were ordered. She underwent a D&E for septic abortion.

Following the procedure, her BP was getting progressively lower and she was transferred to the ICU on pressors, intubated and sedated. An ID consult was called. Blood cultures (one set out of two sets) were positive for gram negative rods (after 9 hours).

The vaginal culture collected 9/28/2011 at 23:08 showed moderate gram negative bacilli with no neutrophils on gram stain 9/29/2011 at 10:59. Cultures of the maternal surface of the placenta and the fetal (infant) surface of the placenta also showed many gram negative bacilli and only rare neutrophils. These and subsequent culture results are found on pages 349-351 of the medical records.

By 9/29/11, her labs were suggestive of DIC and hypocalcemia. Hematology consult was requested. Renal consult was requested for oliguria and AKI. She had been started on ampicillin, clindamycin and gentamicin. Given the blood culture positivity for gram negative rods, ampicillin and clindamycin were changed to Zosyn on the morning of 9/29/2011.

Hematology consult on 9/29/2011 at 9:10 AM diagnosed DIC post stillbirth with gram negative sepsis. A karyotype of blood showed 46,XX, normal female.

On 10/1/2011 at 07:45, E coli was identified from a maternal blood culture. The vaginal culture and cultures of the maternal and fetal surfaces of the placenta also grew out E. coli.

By 10/1/2001 she developed ventricular tachycardia and was being treated aggressively for acidosis. She had blood oozing from her nose and mouth. The

right pupil was fixed and dilated, the left pupil was fixed at 3 mm. She was unresponsive to pain.

An endocrinology consult on 10/2/2011 for hyperglycemia greater than 500 showed hyperglycemia/gestational diabetes, DIC, sepsis, respiratory failure, and acute renal failure with lactic acidosis due to septic shock.

Dr. Rumman developed pulseless electrical activity and was coded twice on 10/2/2011. There was no resumption of pulse following the second code. She was pronounced on 10/2/2011 at 13:22. Cause of death was: severe septic shock, DIC, E. coli bacteremia, and endometritis.

Placental and fetal pathology gross findings:
    The specimen was received in formalin, measuring 8.6 x 7.5 x 1.4 cm and weighing 70 grams. Possible adherent clot measuring 2.8 x 1.6 x 0.8 cm was present. Tan translucent fetal membranes. There was an unremarkable pink-red fetal surface. Three-vessel umbilical cord was dusky in color, measuring 14.8 cm in length. Maternal surface was tan-grey and intact. Serial sectioning showed pink-tan parenchyma containing an area of possible hemorrhage measuring up to 1.1 cm in greatest dimension.
    The fetus was identified by tags outside the yellow pad and inside with the body. The fetus showed a severe degree of maceration, normal head, fused eyelids. The fetus grossly was an otherwise unremarkable male. CR=14.4 cm, CH= 21 cm, right FL=2.5 (cm), left FL=2.5 cm, HC = 15.2 cm, thoracic circumference 12 cm, abdominal circumference = 11.8 cm. Attached umbilical cord was 11.5 cm, otherwise grossly unremarkable. No internal examination performed.

Microscopic examination of the placental pathology slides:
1. 3 vessel cord. Bacteria in fetal blood. No funisitis. Collections of rod bacteria on cord surface. Membranes: acute necrotizing and suppurative chorioamnionitis; abundant bacteria, rods, in amnion, detached amnion, abundant bacteria, rods, in decidua, lots of bacteria;
2. Severe necrotizing acute chorioamnionitis with bacteria.
3. Chorioamnionitis with fresh decidual hemorrhages; villi immature with overwhelming septicemia everywhere, also focally extending into villous parenchyma (rods);
4. Placenta with fresh retroplacental and intervillous hemorrhages; abruption; massive fetal septicemia with acute villitis, villous karyorrhexis;
5. Immature placenta with massive bacterial growth in fetal blood stream, bacteria in maternal blood in intrvillous space; acute villitis, focal; bacteria in villous parenchyma as well; bacteria gram negative on gram stain.

Diagnosis:
1. Immature placenta, 70 gm, with severe acute necrotizing bacterial chorioamnionitis with overwhelming bacterial growth in fetal blood vessels (septicemia) and maternal intervillous space;
2. Fresh retroplacental hemorrhages, decidual hemorrhages, intervillous hemorrhages and blood clot, 2.8 cm, features of premature placental separation;
3. Extremely premature, severely macerated, stillborn male fetus with fused eyelids, dusky cord, and placental villi showing intravascular karyorrhexis; fetal death in utero due to overwhelming bacterial sepsis due to gram negative bacterial rods, and,
4. Gram stain of the placenta shows bacteria to be gram negative rods.


Interpretation:
1. This was a severe, necrotizing acute chorioamnionitis with overwhelming bacterial sepsis in the fetal blood vessels of the immature placenta. The severe extent of the infection with suppuration, necrosis, and massive bacterial growth in the fetal blood vessels of the placenta implies that the infection had been present a number of days, at least 2-3, prior to delivery.
2. The fetal death in utero was due to massive fetal sepsis (blood stream infection). The infection was so overwhelming that fetal death in utero occurred before there was any fetal inflammatory response to infection—no funisitis or chorionic vasculitis.
3. Based on the severe degree of maceration and duskiness of the umbilical cord, the fetus had been dead in utero a number of days prior to delivery.
4. The gram negative rod bacteria that caused the fetal death in utero were present in the mother's blood stream of the placenta at the time of delivery on 9/29/2011.
5. Cultures of the maternal and fetal surfaces of the placenta and vaginal cultures grew out E. coli. Initial gram stains of these sites showed moderate gram negative bacilli and rare neutrophils. This implies that there was only a minimal response to the infection in the vagina and the maternal surface of the placenta.
6. Subsequent maternal blood cultures also showed the bacteria to be E. coli.
7. The mother died as a result of severe septic shock, DIC, E. coli bacteremia, and endometritis.


I hold the above findings to be true to a reasonable degree of medical certainty. I reserve the right to amend these findings as additional information become available.

Sincerely,

Janice M. Lage, MD
Pathologist